**Hersey T. STEPTOE, Mary Ann Mazurek, and Lillian D. Kelley, Individually, and as Representatives of a Class, Plaintiffs,**

**v.**

**The BEVERLY AREA PLANNING ASSOCIATION, a Not for Profit Corporation, organized under the Laws of the State of Illinois, Sis Costello, Individually, and as Agent for the Beverly Area Planning Association, a Not for Profit Corporation, Nancy Doe, Individually and as Agent for the Beverly Area Planning Association, a Not for Profit Corporation, and Unknown Directors of the Beverly Àrea Planning Association, a Not for Profit Corporation, organized under the Laws of the State of Illinois, Defendants.**

**No. 84 C 10926.**

United States District Court, N.D. Illinois, E.D.

Nov. 23, 1987.

Thomas P. James, David S. Morris, Morris & James, Daniel P. Madden, Chicago, Ill., for plaintiff.

James J. Casey, Jeffrey I. Berkowitz, Nancy R. Gamburd, Keck, Mahin & Cate, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

The plaintiffs brought this action on behalf of themselves and a class of minority homeseekers who sought housing assistance at the Beverly Area Planning Association (BAPA) Housing Center from December 21, 1982, to December 21, 1984. The plaintiffs claim that the defendants—BAPA, its directors, and two of its employees—violated the Fair Housing Act of 1968, 42 U.S.C. §§ 3306–3605 (1982) (FHA), and the Civil Rights Act of 1866, 42 U.S.C. § 1982 (1982), by refusing, on the basis of race, to provide the plaintiffs with Beverly area housing listings and by representing that housing was not available when in fact it was. The defendants filed a motion to dismiss, which this court referred to a magistrate for a report and recommendation. The magistrate recommended dismissal of the entire complaint against all defendants. For the following reasons, this court adopts the conclusion, although not the analysis, of the magistrate and enters summary judgment for the defendants.

### I. Facts

BAPA is a private, not-for-profit corporation whose major purpose is to promote the maintenance of a stable, integrated community in the Beverly Hills/Morgan Park area, a small neighborhood located on the southwest side of Chicago. To effectuate this goal, BAPA operates a housing center that provided limited information [1] on some available housing in the area, but only to persons wishing to make "nontraditional moves." BAPA defines nontraditional moves as those consisting of either (1) white persons moving into already integrated areas, or (2) blacks and other minority persons moving into predominantly white (nonintegrated) areas. Thus, BAPA provided information on housing available in the integrated Beverly area only to white persons; black persons, on the other hand, were given assistance in finding housing in nonintegrated areas. This public service was provided without charge.

1. This limited information consisted solely of the location of certain homes for sale and apartments for rent. BAPA obtained this information from persons who voluntarily provided it.

BAPA's justification for this policy was to prevent the sociological phenomenon known as "tipping"—that is, the tendency of an integrated residential area to resegregate rapidly into a predominantly black community once a certain ratio of blacks to whites is reached. *See, e.g.*, Note, *Tipping the Scales of Justice: A Race-Conscious Remedy for Neighborhood Transition*, 90 Yale L.J. 377, 379 & n. 11 (1980). BAPA reasons that tipping can be avoided, and the integrated character of the community maintained, if information regarding nontraditional moves is made available to the public. Commercial residential real estate sales firms, however, generally do not provide such information. BAPA's policy, therefore, was a voluntary attempt to supplement the existing supply of housing information in order to encourage and facilitate nontraditional moves. Once BAPA disseminated this information, however, it had completed its purpose and took no further action: BAPA does not own real estate; it is not a real estate agent or broker; it is not affiliated in any way with real estate owners, agents, or brokers; and it is not involved in the sale, rental, or transfer of real estate. Anyone seeking housing has full, unfettered access to all commercial residential real estate sales organizations.

The plaintiffs in this case all sought assistance at BAPA's Housing Center from October 1982 to December 1984. Two of the named plaintiffs, Hersey T. Steptoe and Lillian D. Kelley, are black, and the other, Mary Ann Mazurek, is white; the proposed class, on the other hand, consists solely of minority homeseekers. In October 1984, Mr. Steptoe went to the Center to get information on the availability of apartment buildings for sale or two-bedroom apartments for rent in the Beverly area. Personnel at the Center explained to him their policy of providing listing information only to those wishing to make nontraditional moves and, in accordance with BAPA's standard practice, showed him a copy of BAPA's policy statement. Because Mr. Steptoe was black, BAPA personnel did not provide him with listings in the Beverly area, but instead offered to refer him to someone who could assist him in finding housing west of Western Avenue in the Evergreen/Oak Lawn area—a predominantly white community.

After that visit, Mr. Steptoe informed Ms. Kelley and Ms. Mazurek of his experience at BAPA, and they decided to "test" [2] the housing referral activities at the Center. When Ms. Mazurek visited the Center, she received a list of two-bedroom apartment referrals in the Beverly area; Ms. Kelley, however, was told that BAPA could help her find housing only in nonintegrated areas. At all times employees at the Center were candid in explaining BAPA's integration policy.

In December 1984, the plaintiffs filed this lawsuit, charging that BAPA violated the Fair Housing Act of 1968 and the Civil Rights Act of 1866 by attempting to influence the choice of prospective homeseekers on the basis of race and by discriminating in the provision of services related to housing. The plaintiffs seek actual and punitive damages totaling $2 million, allegedly for being deprived of the economic, social, and professional benefits of living in the integrated Beverly area and for mental anguish, humiliation, and embarrassment.[3] The defendants filed a motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim, alleging that they are not subject to the coverage of either statute because they do not participate in the sale, rental, or transfer of property. In the alternative, they argue that the housing information activities of

2. In the present context, "testers" are individuals who do not intend to purchase a home or rent an apartment, but who pose as renters or purchasers in order to collect evidence of allegedly discriminatory practices.

3. The plaintiffs originally had sought a permanent injunction as well. After the filing of this lawsuit, however, BAPA altered its policy and now no longer receives or disseminates rental information, and it disseminates information on property for sale to whoever asks for it. This change in policy, BAPA asserts, was due to the excessive costs of litigation and the cancellation of certain insurance policies, and is in no way an admission of fault. Thus, the request for injunctive relief is now moot.

the Center are noncommercial, "pure" speech; applying the statutes to these activities, the defendants assert, would abridge their first amendment rights to freedom of speech and association.

After the defendants filed the motion to dismiss, this court informed the parties that because they referred to facts outside the complaint, the court would treat the motion as one for summary judgment. *See* Minute Order of Mar. 12, 1985.[4] The parties, however, did not follow through with the court's order and continued to treat it as a motion to dismiss. This court referred the motion to a magistrate, who recommended dismissal of the entire complaint for lack of subject matter jurisdiction.[5] At the May 5, 1987, status hearing, this court reiterated that it would treat the motion as one for summary judgment. The court allowed both parties to submit any additional affidavits and other material they wished the court to consider, but only BAPA chose to file a supplemental affidavit. Accordingly, this court will consider—to the extent appropriate—the plaintiffs' verified complaint;[6] the affidavits submitted by Mr. Steptoe, Ms. Kelley, and Ms. Mazurek in connection with their motion for a preliminary injunction; and the affidavit of Mr. Charles Shanabruch, former Executive Director of BAPA.

## II. Motion for Summary Judgment

The purpose of the summary judgment procedure is to determine whether a trial will be necessary—"whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Although the moving party has the burden of establishing that there is no genuine issue of material fact, he may discharge this burden by " 'showing'—that is, pointing out to the District Court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *see id.* at 2553 ("[A] party seeking summary judgment always bears the initial responsibility

4. A court may convert a motion to dismiss into a motion for summary judgment when matters outside the pleadings are presented to and not excluded by the court. The parties then must be given a reasonable opportunity to present additional material. Fed.R.Civ.P. 12(b).

5. Although this court adopts the report and recommendation to the extent that the report recommends dismissing the case, the court does not agree that it has no subject matter jurisdiction. A federal court lacks subject matter jurisdiction when the plaintiff does not present a "substantial" federal claim. *Bell v. Hood,* 327 U.S. 678, 682–83, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946); 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3564, at 66 (2d ed. 1984) [hereinafter Wright & Miller]. To be insubstantial, however, a claim must be "obviously without merit or ... wholly frivolous." *Id.* at 68. "The test for dismissal is a vigorous one and if there is any foundation of plausibility to the claim federal jurisdiction exists." *Id.* at 70–71 (*citing Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 70–71, 98 S.Ct. 2620, 2628–29, 57 L.Ed.2d 595 (1978)). The complaint may still be dismissed, however, for failure to state a claim upon which relief can be granted rather than for lack of jurisdiction. *Id.* at 73–74, 98 S.Ct. at 2630–31.

The plaintiffs in this case clearly have presented a "substantial"—that is, nonfrivolous—claim based upon two federal statutes. The Fair Housing Act contains an express right of action, *see* 42 U.S.C. § 3612, and 28 U.S.C. § 1343(4) confers upon district courts original jurisdiction over claims "[t]o recover damages ... under any Act of Congress providing for the protection of civil rights" (*e.g.,* § 1982), *see Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 412 n. 1, 88 S.Ct. 2186, 2189 n. 1, 20 L.Ed.2d 1189 (1968). Thus, this court has subject matter jurisdiction over the case and, therefore, the power to decide the case on the merits.

6. In a summary judgment proceeding, a verified pleading will be accorded the probative force of an affidavit only if it meets the requirements of Rule 56(e): "[1] [T]he content of the pleading must be asserted on the personal knowledge of the pleader, [2] set forth facts that would be admissible in evidence, and [3] show affirmatively that the pleader is competent to testify to the matters pleaded." 10A Wright & Miller, *supra* note 5, § 2738, at 500–02 (2d ed. 1983).

of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."); *see also* Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183 (1987) (recent Supreme Court cases favor more liberal granting of summary judgment motions). Once the moving party sufficiently has demonstrated the absence of a genuine issue, the opposing party must set forth specific facts in affidavits or otherwise show there are disputed material facts that must be decided at trial. *Celotex,* 106 S.Ct. at 2552–53; *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). Moreover, to avoid the delay and expense of an unnecessary trial, a court considering a summary judgment motion will not strain to find the existence of a genuine issue when none exists. *Kirk v. Home Indem. Co.,* 431 F.2d 554, 559–60 (7th Cir.1970).

Because the defendants brought this summary judgment motion, this court must examine the evidence in a light most favorable to the plaintiffs and draw all reasonable inferences in their favor. *Bowyer v. United States Dep't of Air Force,* 804 F.2d 428, 430 (7th Cir.1986). This court concludes that there are no genuine issues of material fact; the issue, then, is whether, based on the foregoing facts, the defendants are entitled to summary judgment as a matter of law.

## III. Analysis

### A. The Fair Housing Act

The plaintiffs first claim that BAPA, its directors, and two of its employees at the Housing Center violated the Fair Housing Act, whose purpose is "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. Although the plaintiffs have been less than precise in distinguishing between particular subsections of the Act, their claims fall into two general categories: (1) Steering and (2) discrimination in the provision of services related to housing.

#### 1. Steering

The plaintiffs allege that BAPA violated section 3604(a), which provides that

> it shall be unlawful—
>
> (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, *or otherwise make unavailable or deny, a dwelling* to any person because of race, color, religion, sex, or national origin.

*Id.* § 3604(a) (emphasis added). Since the plaintiffs do not allege that BAPA sells, rents, or negotiates for the sale or rental of a dwelling, the only issue under section 3604(a) is whether BAPA "otherwise ma[de] unavailable or den[ied]" a dwelling to the minority plaintiffs solely because of their race.

Courts have characterized this general, catchall language to be "as broad as Congress could have made it," *Zuch v. Hussey,* 366 F.Supp. 553, 557 (E.D.Mich.1973), and therefore have construed the section liberally to effectuate the goals of the Act. Thus, although section 3604(a) applies principally to the sale or rental of dwellings, it also encompasses a wide variety of discriminatory practices that affect detrimentally the availability of housing to minorities and thereby make housing more difficult to obtain. *Southend Neighborhood Improvement Ass'n v. County of St. Clair,* 743 F.2d 1207, 1209–10 (7th Cir.1984); *see, e.g., Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights,* 558 F.2d 1283 (7th Cir.1977) (village zoning policy that effectively foreclosed construction of low-income housing may have made housing unavailable), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978); *Stackhouse v. DeSitter,* 620 F.Supp. 208, 211 n. 6 (N.D.Ill.1985) (firebombing of car, making plaintiff apprehensive about entering his dwelling, may make dwelling "unavailable" within meaning of § 3604(a)) (dictum); *Dunn v. Midwestern Indem. Co.,* 472 F.Supp. 1106 (S.D.Ohio 1979) (insurance redlining); *United States v. American Inst. of Real Estate Appraisers of the*

*Nat'l Ass'n of Realtors,* 442 F.Supp. 1072 (N.D.Ill.1977) (appraisers who treat race as negative factor in determining value of dwellings and soundness of home loans may make housing unavailable), *appeal dismissed,* 590 F.2d 242 (7th Cir.1978); *Laufman v. Oakley Bldg. & Loan Co.,* 408 F.Supp. 489 (S.D.Ohio 1976) (mortgage redlining). Despite the broad scope of the section, however, courts still have insisted upon a showing that the discriminatory action directly affected the availability of housing. *See Southend,* 743 F.2d at 1209–10.

The plaintiffs in this case contend that BAPA violated section 3604(a) by engaging in racial steering—that is, "directing prospective home buyers interested in equivalent properties to different areas according to their race." *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 94, 99 S.Ct. 1601, 1605, 60 L.Ed.2d 66 (1979).[7] According to the plaintiffs, BAPA's policy of not providing blacks with Beverly area housing information amounted to an attempt to influence the choice of prospective homeseekers on the basis of race. The withholding of such information, the plaintiffs assert, effectively deprived blacks of equal housing opportunities and made housing more difficult to obtain.

This court concludes, as a matter of law, that BAPA's activities could not have affected the availability of housing in a manner implicating section 3604(a). First, BAPA could not have affected adversely the housing opportunities available to either blacks or whites because BAPA did not participate in or influence any commercial transactions: BAPA owns no real estate, is not a real estate agent or broker, is not associated with agents or brokers (entities that dominate the commercial housing market), and is not involved in the actual mechanics of sale or rental transactions.

In addition, BAPA did not deprive anyone of the housing information needed to make traditional moves because this information was readily available through all commercial channels, which were unaffected by BAPA's limited activities.[8] Indeed, BAPA's policy of providing information only on nontraditional moves served to increase, not decrease, the existing supply of housing information.[9]

7. Courts have defined steering in various ways. Most, however, focus on the fact that steering is largely a phenomenon of the commercial real estate market and that its purpose is to maintain racially segregated communities. *See, e.g., Havens Realty Corp. v. Coleman,* 455 U.S. 363, 366 n. 1, 102 S.Ct. 1114, 1118 n. 1, 71 L.Ed.2d 214 (1982) ("'[R]acial steering' is a 'practice by which real estate brokers and agents preserve and encourage patterns of racial segregation ... by steering members of racial and ethnic groups to buildings occupied primarily by members of such racial and ethnic groups....'"); *Village of Bellwood v. Dwayne Realty,* 482 F.Supp. 1321, 1330–31 (N.D.Ill.1979).

Because BAPA is not a real estate agent or broker, and its policy of promoting residential integration is consistent with the goals of the Act, the defendants urge that BAPA is exempt from liability under § 3604(a). The defendants, however, misconstrue the scope of the section. Section 3604(a) does not merely prohibit "steering"—however, defined; rather, it prohibits all practices having the *effect* of making housing unavailable to minorities. Although courts have held that when real estate agents or brokers engage in steering they necessarily affect the availability of housing, no court has addressed the legality of race-conscious activities of nonprofit information organizations like BAPA, who do not participate in commercial real estate transactions. The question, therefore, is not whether BAPA's activities necessarily may be characterized as "steering"; it is whether they could have affected adversely the availability of housing to minorities.

8. The only place the plaintiffs attempt to contest this fact is in their response to the motion to dismiss, in which they speculate that BAPA may have been the only effective and functional clearinghouse for housing information. Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss at 9–10. Although the plaintiffs were given the opportunity to support these assertions by filing supplemental affidavits, they chose not to do so. Consequently, Mr. Shanabruch's statements in his sworn affidavit, in which he attests to the ready availability of traditional housing information, are uncontroverted.

9. *Cf.* Lind, *Maintaining Residential Integration: Municipal Practices and Law,* 31 Clev.St.L.Rev. 603, 639–40, 642 (1982) (footnotes omitted; emphasis in original):

> [T]he current definitions of unlawful racial steering assume that it *limits* housing opportunity while race-conscious affirmative marketing *expands* choice.... Affirmative marketing ... is *permissive.* It aims to attract and

Finally, BAPA's practice of fully informing homeseekers of its policy [10] avoided the dangers inherent in the typical steering situation involving real estate agents or brokers. There, prospective black homeowners expect to receive comprehensive housing information. When real estate agents withhold listings of homes in predominantly white areas, they effectively make that housing "unavailable" because blacks are unaware of these housing options. By contrast, the plaintiffs in this case at all times were apprised of BAPA's policy not to provide comprehensive housing information and therefore could not have been blindly "steered" into particular areas.

Cases holding that coverage under the Act is not limited to those who sell, rent, or finance real estate are not inconsistent with this conclusion. Even the most expansive interpretations of section 3604(a) do not extend coverage beyond entities that directly provide housing or those that are integrally involved in the sale or financing of real estate. For example, in *United States v. Hughes Memorial Home,* 396 F.Supp. 544, 549 (W.D.Va.1975), the court held that a private, noncommercial home for needy children violated section 3604(a) when it refused to provide housing for black children. The practices in *Hughes,* however, are easily distinguishable from those of BAPA, for BAPA did not engage in the provision of housing and therefore could not have made housing unavailable. *See also id.* (catchall language applies to all practices with *effect* of denying dwellings); *cf. Otero v. New York City Hous. Auth.,* 484 F.2d 1122 (2d Cir.1973) (municipal housing authority that provided housing is subject to FHA); *Burney v. Housing Auth.,* 551 F.Supp. 746 (W.D.Pa.1982) (same).

Other cases involve entities, such as multiple listing services (MLS's) [11] and real estate appraisers, that do not directly participate in the sale or financing of real estate but that nevertheless exercise sufficient control over the market so as to affect detrimentally the availability of housing. For example, in *Fair Housing Council, Inc. v. Eastern Bergen County Multiple Listing Service, Inc.,* 422 F.Supp. 1071, 1075 (D.N.J.1976), the court held that an MLS could be liable under the Act if it functioned as a "crucial intermediary" between buyers and sellers in the real estate market. *But cf. Wheatley Heights Neighborhood Coalition v. Jenna Resales Co.,* 447 F.Supp. 838 (E.D.N.Y.1978) (MLS did not violate Act, but only because it exerted no control over its participating brokers). In addition, the court in *American Institute of Real Estate Appraisers* held that real estate appraisers who discriminated against blacks in determining the value of homes and the soundness of home loans could have made housing unavailable. 442 F.Supp. at 1079.

BAPA, by contrast, is not an MLS. Nor does it replace brokers as intermediaries between buyers and sellers in the real estate market. Rather, BAPA is a charitable organization espousing the cause of racial integration. In sum, the allegation that

> influence housing consumers and providers in a manner favorable to residential integration. The consumer may indeed choose not use a housing service and yet is not cut off from buying or renting dwellings.... While a municipality may allocate its informational services to take into account racially discriminatory conditions in the housing market, affirmatively marketing its service does not limit or close off the number of homes for sale or apartments for rent in the private market.

10. BAPA's practice was to have prospective homeseekers read its policy statement. Indeed, Mr. Steptoe asked for, and received, a copy of this statement and appended it to his affidavit.

11. Multiple listing services typically are defined as

> associations of real estate brokers. When residential real property is placed for sale with a brokerage agency which is a member of a multiple listing service, the property may be "listed" by all members of the service, thereby increasing the exposure of the property. Members of the multiple listing services circulate daily bulletins and engage in cooperative advertising. When a sale is made through the services of a multiple listing service, the brokerage commission is apportioned between the broker who lists the property with the service and the broker who actually effects the sale.

*Fair Hous. Council, Inc. v. Eastern Bergen County Multiple Listing Serv., Inc.,* 422 F.Supp. 1071, 1075 (D.N.J.1976).

BAPA's policy of providing information only for nontraditional moves violated section 3604(a) by somehow making housing "more difficult to obtain" is without merit.

Closely related to the section 3604(a) steering claim is the allegation that BAPA violated section 3604(d) by representing to the black plaintiffs that Beverly area housing was not available when in fact it was.[12] For many of the same reasons, this claim likewise lacks merit. First, because BAPA personnel fully informed those visiting the Center that BAPA did not provide comprehensive housing information, BAPA's denying the plaintiffs access to limited housing information could not have amounted to representing that available housing was "unavailable." Moreover, if the plaintiffs are alleging that BAPA personnel affirmatively misrepresented the availability of certain dwellings, this claim is clearly contradicted by the plaintiffs' own affidavits, which demonstrate that BAPA personnel never made such misrepresentations.

**2. Discrimination in Services Related to Housing**

The plaintiffs' remaining FHA claims [13] deal with discrimination in the provision of services related to housing. First, the plaintiffs allege that BAPA violated

12. Section 3604(d) provides that "it shall be unlawful ... [t]o represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available."

13. Even though the plaintiffs have not specifically alleged violations of § 3604(c) or § 3604(e), this court nevertheless finds that BAPA's informational activities could not have violated either subsection. First, § 3604(c) prohibits "mak[ing], print[ing], or publish[ing], or caus[ing] to be made, printed, or published any notice, statement, or advertisement, *with respect to the sale or rental of a dwelling* that indicates any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c) (emphasis added). BAPA's policy statement was simply a declaration of BAPA's commitment to encourage and facilitate nontraditional moves and therefore was not a statement made "with respect to the sale or rental" of a particular dwelling.

Cases holding liable entities that do not directly sell or rent housing are distinguishable. *See, e.g., Mayers v. Ridley,* 465 F.2d 630 (D.C.Cir. 1972) (§ 3604(c) prohibits recorder of deeds from accepting for filing instruments that contain racially restrictive covenants); *United States v. Hunter,* 459 F.2d 205 (4th Cir.) (newspaper that published discriminatory notice relating to sale or rental of dwelling violated § 3604(c)), *cert. denied,* 409 U.S. 934, 93 S.Ct. 235, 34 L.Ed.2d 189 (1972). In those cases, the statement itself related to discriminatory terms and conditions for selling or renting housing. BAPA's statement, by contrast, expresses no such condition. Moreover, the newspaper in *Hunter* functioned as a direct conduit of information between buyers and sellers in the commercial market. *See* 459 F.2d at 210 ("In the context of classified real estate advertisements, landlords and brokers 'cause' advertisements to be printed or published and generally newspapers 'print' and 'publish' them."); *see also Mayers,* 465 F.2d at 649 ("While it may be strictly correct to say the Recorder [of Deeds] himself does not do any selling or renting, he is involved in the commercial real estate market, both before and after a sale."). BAPA, however, is not involved in commercial real estate transactions; its policy statement therefore could not have functioned in this manner.

Second, § 3604(e)—the "antiblockbusting" provision—makes it unlawful "[*f*]*or profit,* to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, or national origin." 42 U.S.C. § 3604(e) (emphasis added); *see also United States v. Bob Lawrence Realty, Inc.,* 474 F.2d 115, 119 (5th Cir.) ("Blockbusting has been described as a process through which individuals stimulate and prey '... on racial bigotry and fear by initiating and encouraging rumors that negroes ... [are] about to move into a given area, that all non-negroes ... [will] leave, and that the market values of properties ... [will] descend to "panic prices" with residence in the area becoming undesirable and unsafe for non-negroes.' ") (*quoting Contract Buyers League v. F & F Inv.,* 300 F.Supp. 210, 214 (N.D.Ill.1969)), *cert. denied,* 414 U.S. 826, 94 S.Ct. 131, 38 L.Ed. 2d 59 (1973). Nowhere do the plaintiffs allege that BAPA personnel ever attempted to "induce" anyone to sell or rent housing, much less that they engaged in "blockbusting." Moreover, because BAPA is a nonprofit, noncommercial organization, its activities could not have violated § 3604(e), which is aimed at commercial activity and commercial speech made to gain profit from racial representations. *See Bob Lawrence,* 474 F.2d at 121–22; *see also id.* at 122 (" '[The words "for profit"] were evidently included in § 3604(e) to distinguish and eliminate from the operation of that subsection statements made in

section 3604(b), which prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race...." As stated earlier, however, BAPA's role in supplying voluntarily and without charge limited housing information regarding nontraditional moves is too far removed from transactions in the commercial residential market to be considered services "in connection" with the sale or rental of a dwelling.

The plaintiffs' final FHA claim, based on section 3605, borders on the frivolous. Section 3605 prohibits banks, insurance companies, and other associations whose business consists in whole or in part of the making of commercial real estate loans from denying financing assistance to persons because of their race.[14] The defendants have alleged no facts showing that BAPA makes commercial real estate loans; in fact, BAPA has no connection whatsoever with the financing of real estate. BAPA simply is not engaged in any commercial business. Thus, due to the limited nature and purpose of BAPA's informational activities, which are wholly consistent with the spirit of the Fair Housing Act, this court concludes that the defendants did not violate the Act by providing housing information only to persons wishing to make nontraditional moves.[15]

### B. Section 1982

The plaintiffs also allege that BAPA's activities violated 42 U.S.C. § 1982, which provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." To effectuate the remedial purposes of the statute, courts have liberally construed this language to protect "not merely the enforceability of property interests acquired by black citizens but also their right to acquire and use property on an equal basis with white citizens." *City of Memphis v. Greene,* 451 U.S. 100, 120, 101 S.Ct. 1584, 1597, 67 L.Ed.2d 769 (1981).

In evaluating a section 1982 claim, a court first must identify the plaintiff's alleged property interests—if any—and then determine whether the defendant's activities impaired those property rights. *Id.* at 123, 101 S.Ct. at 1598; *Southend,* 743 F.2d at 1211. The first possible property right of the plaintiffs is their right freely to buy or rent homes, a right certainly recognized by section 1982. *See, e.g., Greene,* 451 U.S. at 121, 101 S.Ct. at 1597 (section 1982 applies to all racially motivated refusals to sell or rent housing). BAPA's conduct, however, in no way could have impaired these property interests: BAPA exerted no control over the housing market, and the plaintiffs easily could have obtained the necessary housing information from traditional commercial channels, which were readily available to them. Thus, the plaintiffs have failed to demonstrate a sufficient causal connection between BAPA's activi-

social, political or other contexts, as distinguished from a commercial context, where the person making the representations hopes to obtain some financial gain as a result of the representations.' ") (*quoting United States v. Mintzes,* 304 F.Supp. 1305, 1312 (D.Md.1969)).

**14.** Section 3605 provides that

> it shall be unlawful for any bank, building and loan association, insurance company or other corporation, association, firm or enterprise whose business consists in whole or in part in the making of commercial real estate loans, to deny a loan or other financial assistance to a person applying therefor for the purpose of purchasing, constructing, improving, repairing, or maintaining a dwelling, or to discriminate against him in the fixing of the amount, interest rate, duration, or other terms or conditions of such loan or other financial assistance, because of the race, color, religion, sex, or national origin of such person or of any person associated with him in connection with such loan or other financial assistance or the purposes of such loan or other financial assistance, or of the present or prospective owners, lessees, tenants, or occupants of the dwelling or dwellings in relation to which such loan or other financial assistance is to be made or given....

**15.** This opinion in no way carves out a per se exemption from the Act for nonprofit organizations that promote integrated housing. Rather, the key factor in this case is that BAPA has no connection with the commercial real estate market and therefore could not have deprived blacks of equal housing opportunities.

ties and any impairment of the plaintiffs' right to buy or rent housing.

The other possible property right of the plaintiffs is the right to receive comprehensive housing information. In *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 413 n. 10, 88 S.Ct. 2186, 2189 n. 10, 20 L.Ed.2d 1189 (1968), the Supreme Court expressly reserved the question whether ancillary services in connection with the sale or rental of a dwelling—such as financing arrangements and the provision of brokerage services—might in some situations constitute "property" under section 1982. This court concludes that the plaintiffs do not have a property right cognizable under section 1982 to receive comprehensive housing information from voluntary, noncommercial organizations, such as BAPA, that have no connection with the established commercial real estate market and which therefore do not impair the rights of black persons to "inherit, purchase, lease, sell, hold, and convey" real property. This conclusion, moreover, is consistent with the Supreme Court's statement in *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 373, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982), that "Congress [through 42 U.S.C. § 3604(d) ][16] has thus conferred on all 'persons' a legal right to truthful information about available housing." BAPA never disseminated false information about available housing; rather, it selectively provided certain additional information to specific homebuyers to further the worthy purposes of the FHA: the maintenance of integrated residential neighborhoods.[17]

## IV. Conclusion

For the reasons set forth above, this court grants the defendants' motion for summary judgment on all counts of the complaint.

16. *See supra note* 12.

17. Because this court concludes that BAPA is not liable under the FHA or § 1982, it need not consider either the legality of race-conscious activities by entities that do fall within the scope of the statutes or the validity of the defendants' first amendment defense.