### UNITED STATES of America

v.

### MASSACHUSETTS INDUSTRIAL FINANCE AGENCY.

Civil Action No. 94–30017–MAP.

United States District Court,
D. Massachusetts.

Jan. 16, 1996.

Karen L. Goodwin, United States Attorney's Office, Springfield, MA, Patrick J. Markey, Housing and Civil Enforcement Section, Civil Rights Division, Department of Justice, Washington, DC, Deval L. Patrick, Asst. Atty. Gen., Christine R. Ladd, Brian F. Heffernan, Myron S. Lehtman, Housing and Civil Enforcement Section, Civil Right Division, U.S. Department of Justice, Washington, DC, Paul F. Hancock, Chief, United States Department of Justice, Washington, DC, for U.S.

David Engle, Robert D. Fleischner Center for Public Representation, Northampton, MA, for New England Adolescent Research Institute, Inc.

Shepard M. Remis, U. Gwyn Williams, Gus P. Coldebella, Goodwin, Procter & Hoar, Boston, MA, for Massachusetts Industrial Finance Agency.

*MEMORANDUM REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT AND DEFENDANT'S MOTIONS TO STRIKE*

(Docket Nos. 69, 71, 76 & 81)

PONSOR, District Judge.

## I. INTRODUCTION

Plaintiff United States of America and plaintiff-intervenor New England Adolescent Research Institute ("NEARI") allege that defendant Massachusetts Industrial Finance Agency ("MIFA") discriminated against NEARI on the basis of handicap, in violation of the Fair Housing Amendments Act of 1988 ("FHAA"), Pub.L. No. 100–430, 102 Stat. 1619 (codified at 42 U.S.C. §§ 3604(a)–(e), 3607(b)(1)). Plaintiffs have filed a motion for partial summary judgment on limited issues, and defendant has filed a cross-motion for summary judgment on all issues and two motions to strike. For the reasons set forth below, plaintiffs' motion for summary judg-

ment will be allowed in part and defendant's cross-motion for summary judgment and motions to strike will be denied.

## II. FACTUAL BACKGROUND

The relevant undisputed facts are set forth below. Factual disputes are noted accordingly.

MIFA is a quasi-public agency established to promote private investment, job creation, and public welfare through a variety of conduit financing schemes. See Mass.Gen.L. ch. 23A, §§ 29–38, and ch. 40A (1992). MIFA issues tax-exempt bonds for qualifying organizations, which may apply the proceeds toward the acquisition of property, the construction and renovation of buildings, and refinancings.

Qualifying organizations apply to MIFA for tax-exempt bond financing. If an application is in order, its board of directors may grant "official action" status, or preliminary approval to the project. The applicant and its agents, occasionally with the agency's assistance, then attempt to locate purchasers for the bonds. Upon final approval of the project, MIFA issues the bonds to the purchasers. The applicant is solely responsible for financing the debt on the bonds.

NEARI is a non-profit educational corporation organized to diagnose, treat, and educate emotionally disturbed adolescents. In early 1988, it began the process of developing a residential school in Western Massachusetts. In June 1989, NEARI purchased property in Buckland, Massachusetts, for $375,000 with a conventional bank loan. Then on September 11, 1989, it applied to MIFA for $4.5 million tax-exempt bond financing to develop a residential school on the Buckland site.

Plans to house between 24 and 28 students at the Buckland facility were frustrated when the property failed to meet percolation standards. NEARI then began the search for an additional site. On October 5, 1989, it entered into a purchase-and-sale agreement for a parcel in Plainfield, Massachusetts ("the Jones Road site"), and on October 16, notified MIFA by letter that it was amending its application to include the Jones Road site. On November 7, 1989, MIFA granted "official action" status to the amended application.

Three days later, MIFA informed officials of the Town of Plainfield about the status of the NEARI project. On December 13, 1989, the Plainfield planning board informed MIFA of its concerns with the proposed project, including its supposed impact on town services and the safety and general welfare of local residents. On December 28, after a public hearing on the proposed residential school, the Plainfield board of selectmen notified the agency that it was endorsing the planning board's concerns. Shortly thereafter, and in light of Mass.Gen.L. ch. 61A (1992), which gives cities and towns a right of first refusal to purchase agricultural lands to be sold for or converted to residential use, NEARI withdrew from its agreement to purchase the Jones Road site.

On March 15, 1990, NEARI executed another purchase-and-sale agreement for another site in Plainfield ("the Cummington Farms site"). By letter dated April 4, 1990, it informed the Plainfield board of selectmen that its financial consultants and attorneys were working with MIFA to alter the site descriptions and financing set forth in its original application and amendment.

On April 26, 1990, another public hearing was held on the proposed residential school. Both state and local representatives were in attendance, and the local press covered the event. At the hearing, a substantial number of Plainfield residents voiced their opposition to the project. The reason for this opposition is a matter of considerable dispute. Plaintiffs contend that opinions expressed at the hearing indicate the town's discriminatory animus against NEARI's clientele. MIFA, on the other hand, claims that the opposition to the project largely stemmed from increased demand on municipal services.

Shortly after the April 26 hearing, MIFA's general counsel, Richard Skerry, spoke with the executive director of NEARI, Dr. Steven Bengis, about the application for tax-exempt bond financing. The substance of this conversation is in partial dispute. In essence, however, Skerry told Bengis that the application's success hinged on NEARI's efforts to address the town's concerns.

On May 23, 1990, the executive director of MIFA, Joseph Blair, wrote to Bengis that

substitution of the Jones Road and Cummington Farms sites constituted a material change to the application for tax-exempt bond financing and required a reevaluation of the project. Blair further wrote: "At such time as the statutory finding and public opposition issues are adequately addressed to our satisfaction, we are willing to continue our efforts on behalf of NERI [sic]."

Bengis and Blair met on July 1, 1990 to discuss the future of the project. At that time, Blair questioned NEARI's ability to finance the debt on the applied-for bond. Over the next several months, the parties corresponded about NEARI's financial condition and local opposition to the project. In September 1990, NEARI requested a final decision on the project. The deputy executive director and chief operations officer of MIFA, Michael Meyers, wrote to Bengis on October 9, 1990, that "after consideration of all the facts and circumstances, it is MIFA's opinion that the Project is not feasible at this time." Meyers added that once NEARI had demonstrated the project's financial viability and resolved community concerns, the agency might reconsider NEARI's application.

NEARI filed a complaint against MIFA with the U.S. Department of Housing and Urban Development ("HUD") on May 6, 1991, alleging discrimination on the basis of handicap in violation of the FHAA. On October 15, 1993, the Secretary of HUD found reasonable cause to believe that the agency had engaged in discriminatory conduct and issued a charge to that effect. The United States filed a complaint with this court on January 27, 1994, alleging discriminatory housing practices in violation of the FHAA, and seeking compensatory and punitive damages under 42 U.S.C. §§ 3612(*o*)(3) & 3613(c)(1).

### III. MOTIONS TO STRIKE

 In its first motion to strike, defendant objects to several of plaintiffs' exhibits on grounds that they are inadmissible.[1] The motion will be denied with the proviso that Exhibits 16, 17, 18, 19, and 22 (letters to defendant from Plainfield residents, town

counsel and elected officials), and Exhibit 24 (a purported statement at the April 26, 1990 hearing in Plainfield) will be considered only to establish defendant's notice of community opposition to the project, assuming proper authentication. Exhibits 26, 30, and 31 (newspaper articles quoting Skerry as opposed to the project) have been disregarded in ruling on these motions. They may or may not be admissible at trial depending on proper foundation.

In its second motion to strike, defendant objects to plaintiffs' inclusion of additional expert testimony in their opposition memorandum. The court has disregarded this testimony but (as will be seen) has nevertheless found genuine issues of material fact on the issue of damages. For this reason, defendant's second motion to strike will be denied as moot. The question whether plaintiffs may offer additional expert testimony at trial (in view of its apparently untimely disclosure) may be raised again by a motion *in limine*.

### IV. SUMMARY JUDGMENT STANDARD

 The court may allow a motion for summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. If the moving party properly supports its motion—producing affirmative evidence to support its claim or defense, or showing the absence of evidence to support the nonmoving party's case—the opposing party must go beyond the pleadings and set forth specific facts establishing a genuine issue for trial. If a reasonable factfinder could resolve a factual dispute in favor of the nonmoving party, and resolution of that dispute has the potential of changing the outcome of the suit under governing law, then summary judgment is not appropriate. *See McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995).

### V. DISCUSSION

#### A. Statutory Construction

Plaintiffs' and defendant's cross-motions raise several issues of statutory construction.

---

1. The court rejects defendant's argument that plaintiffs have violated Local Rule 56.1 and, excepting any inadmissible evidence, will consider plaintiffs' statement of facts.

These are addressed in turn.[2]

1. *Existence of "Handicap"*

42 U.S.C. § 3602(h) provides:

"Handicap" means, with respect to a person—

(1) a physical or mental impairment which substantially limits one or more of such person's major life activities,

(2) a record of having such an impairment, or

(3) being regarded as having such an impairment, but such term does not include current, illegal use of or addiction to a controlled substance (as defined in section 802 of Title 21).

Both sides have moved for summary judgment on the issue of whether NEARI's students satisfy the definition of "handicap" set forth in § 3602(h). Defendant argues that the students are neither mentally impaired[3] nor limited in one or more major life activities. Plaintiffs assert otherwise.

Regulations promulgated under the FHAA provide the starting point for the court's inquiry. Under these regulations, "handicap" is defined in relevant part as "any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 24 C.F.R. § 100.201(a)(2) (1995). "Major life activities" are defined as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *Id.* at § 100.201(b).

Both sides agree that NEARI admits students with certain "defining characteristics," including impulsive and obsessive-compulsive behavior, psychosis, borderline personality disorders, depression, post-traumatic stress disorder, anti-social personality disorder, and other professionally recognized psychiatric diagnoses. The students at issue here, the parties further agree, were at all times individuals whom state or local authorities determined to be in need of NEARI's services.

■ On the basis of these facts, a factfinder may easily conclude that the students were handicapped. The students at issue suffered one or more emotional or mental illnesses that substantially limited their ability to learn and work in a regular environment. For example, Patricia G. Cutler, a NEARI staff member, indicated in deposition testimony that NEARI students cannot participate in a regular educational program. Indeed, given NEARI's purpose, mere placement in one of its residential schools is strong evidence of an inability to function in a regular environment.

Contrary to defendant's assertions, there is no void of evidence showing the existence of handicap. Plaintiffs' motion for summary judgment will therefore be allowed and defendant's denied. Whether any particular student fails to satisfy the definition of handicap may be revisited at trial, if appropriate, by a motion for reconsideration.

2. *The "Direct Threat" Exception*

42 U.S.C. § 3604(f)(9) reads:

Nothing in this subsection requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others.

---

**2.** Two issues require little discussion. First, plaintiffs argue that the proposed residential school satisfies the definition of "dwelling" set forth in 42 U.S.C. § 3602(b). Relevant case law supports this conclusion (*see* Plaintiffs' Memorandum in Support Their Motion for Summary Judgment at 25–26) and defendant does not dispute it. Therefore, the court will allow plaintiffs' motion for summary judgment on this issue.

Second, defendant argues that HUD's failure to complete its investigation of NEARI's claim within 100 days pursuant to 42 U.S.C. § 3610(a)(1)(B)(iv) has prejudiced its case. This argument lacks merit. The act authorizes HUD to extend its investigation upon written notice to the complainant and respondent, *see* 42 U.S.C. § 3610(a)(1)(C), which happened here. Inferring a good cause for extending the investigation, *see Baumgardner v. Secretary, HUD ex rel Holley*, 960 F.2d 572, 578 (6th Cir.1992), and finding no persuasive evidence of prejudice to defendant, the court concludes that HUD operated well within its discretion.

**3.** The parties agree that the students are not physically impaired.

■ Both sides have moved for summary judgment on the applicability of the "direct threat" exception. The Court of Appeals has warned that "ambiguous exemptions from [Fair Housing Act] liability are to be *narrowly* construed." *Hogar Agua y Vida en el Desierto v. Suarez–Medina,* 36 F.3d 177, 181 (1st Cir.1994) (emphasis in original). Invocation of the "direct threat" exemption requires "objective evidence that is sufficiently recent as to be credible, and not from unsubstantiated inferences, that the applicant will pose a direct threat to the health and safety of others...." H.R.Rep. No. 711, 100th Cong., 2d Sess. (1988), *reprinted in* 1988 U.S.C.C.A.N. 2173, 2191 (explaining § 3604(f)(9) exemption).

■ Defendant has extracted a number of items from student records which, it argues, demonstrate that the proposed residential school posed a direct threat to the Plainfield community. Plaintiffs characterize defendant's use of the students' histories as manipulative, and point to the program's safety components. On this tangled record, the court finds disputed issues of material fact, making summary judgment for either side inappropriate.[4]

### 3. *Applicability of 42 U.S.C. § 3604(f)(1)*

Both parties have moved for summary judgment on the issue of defendant's liability under the FHAA. The act's applicability to tax-exempt bond financing is one of first impression. Since the parties do not dispute defendant's role in the conduit bond financing process, this issue is ripe for summary judgment.

42 U.S.C. § 3604(f)(1) makes it unlawful

[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter,

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(C) any person associated with that buyer or renter.

Plaintiffs argue that the FHAA's "pronouncement of a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream," H.R.Rep. No. 711, *supra,* at 18, *reprinted in* 1988 U.S.C.C.A.N. at 2173, 2179, coupled with judicial recognition of § 3604(f)(1)'s application to a wide array of activities, *see Casa Marie, Inc. v. Superior Court of Puerto Rico,* 988 F.2d 252, 257 n. 6 (1st Cir.1993), supports a broad interpretation of the language "otherwise make unavailable or deny"—including discriminatory denials of conduit bond financing. Defendant argues that the scope of § 3604(f)(1) liability does not encompass conduit bond financing.

The critical question is not whether one type of conduct exactly parallels another type already explicitly proscribed by the FHAA. Rather, the issue is whether the defendant's activity is "integrally involved in the sale or financing of real estate." *Devereux Foundation, Inc. v. O'Donnell,* No. 89–6134, 1990 WL 2796, at *6 (E.D.Pa. Jan. 12, 1990) (quoting *Steptoe v. Beverly Area Planning Ass'n,* 674 F.Supp. 1313, 1320 (N.D.Ill.1987)).

■ An analogy to property insurers is instructive. Few, if any, banks make home loans to uninsured borrowers. Thus, property insurers in effect have the power to make housing unavailable to potential buyers. Accordingly, charging higher rates or declining to insure a person because of that person's membership in a protected class has been found to constitute a violation of the FHAA. *See N.A.A.C.P. v. American Family Mut. Ins. Co.,* 978 F.2d 287, 301 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2335, 124 L.Ed.2d 247 (1993).

To be sure, conduit bond financing is a highly specialized type of financing, largely foreign to the average borrower. The apparent dissimilarity between conventional bank financing and conduit bond financing is less striking, however, once the mystique of bond financing is put to one side. The conduit

---

4. Plaintiffs also argue that defendant has used the student records, made available during discovery, to develop a *post hoc* justification for its alleged discrimination. The court may review defendant's use of these records at trial.

bond financing agency, like the property insurer, links like-minded parties seeking to transact business on mutually agreeable terms. Without the agency's authorization, the qualifying organization cannot transact business in the tax-exempt bond market. In this way, the conduit bond financing agency makes housing unavailable no less than other actors with the power to block the sale or rental of housing. Moreover, it cannot fairly be denied that the agency is "integrally involved" in real estate transactions.

*Michigan Protection and Advocacy Service, Inc. v. Babin,* 18 F.3d 337 (6th Cir. 1994), on which defendant relies, does not compel a different conclusion. In *Babin,* the court held that persons who solicited and contributed funds to a neighbor to purchase a house and allegedly prevent the execution of a lease to mentally disabled persons could not be held liable under § 3604(f)(1). *Id.* at 345. The court drew a distinction between deprivation through discriminatory competition, which is not actionable under the FHAA, and deprivation through discriminatory "assistance," which is. *Id.* Defendant's alleged misconduct falls more properly into the latter category, and therefore § 3604(f)(1) applies.

 Well accepted canons of statutory construction also compel this conclusion. Ambiguous phrases must be read in a manner consistent with the statute's broad remedial purpose. *See Hogar Agua y Vida,* 36 F.3d at 177. The phrasing "otherwise make unavailable or deny" does contain some degree of ambiguity—*see American Family,* 978 F.2d at 298—which is to be construed in plaintiffs' favor.

In sum, for the reasons set forth above, the court will allow plaintiffs' motion for summary judgment on the issue of § 3604(f)(1)'s applicability.

### 4. *Applicability of 42 U.S.C. § 3605*

42 U.S.C. § 3605 provides in part:

(a) It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of ... handicap....

(b) As used in this section, the term "residential real estate-related transaction" means any of the following:

(1) The making or purchasing of loans or providing other financial assistance—

(A) for purchasing, constructing, improving, repairing, or maintaining a dwelling....

Plaintiffs contend that the discriminatory withholding of tax-exempt bonds to be used "for purchasing, constructing, improving, repairing, or maintaining a dwelling" triggers liability under § 3605. Defendant counters that it does not provide "financial assistance" to its applicants; rather, it merely acts as a "conduit" through which money from others flows.

 The boundaries of liability under § 3605 largely remain unexplored. In *American Family,* however, the Seventh Circuit, in declining to hold property or casualty insurers liable under § 3605, used language supporting defendant's liability in this case. The court explained:

It would strain language past the breaking point to treat property or casualty insurance as "financial assistance"—let alone as assistance "for purchasing ... a dwelling". Insurers do not subsidize their customers *or act as channels* through which public agencies extend subsidies. They do not "assist" customers even in the colloquial sense that loans are "assistance" (a lender advances cash, with repayment deferred). Payment runs from the customer to the insurer.

978 F.2d at 297 (emphasis supplied).

An insurer does not provide a necessary conduit through which funds flow; the defendant here does. Moreover, this conclusion is supported by regulations promulgated under the FHAA. *See* 24 C.F.R. § 100.120 (1995) ("Prohibited practices under this section include ... failing or refusing to provide to any person ... approval of loans or financial assistance ... because of ... handicap...."). The central issue in this case will be whether the defendant failed to provide approval of assistance based on handicap.

The controversy falls right within the definition of prohibited practices.

MIFA is a quasi-public agency empowered to issue tax-exempt bonds on behalf of qualifying organizations. After the bonds have been sold, it issues the proceeds to the qualifying organizations. In so doing, it extends "financial assistance" to its bond-financing applicants. Thus, the agency performs under the § 3605 umbrella.

Defendant's argument that it does not provide "financial assistance" because it does not provide funds *directly* to applicants is unconvincing. Defendant relies too heavily on its "conduit" status. Even ordinary banks typically act as "conduits" to some extent. A bank pays interest on depositary accounts, and then uses those funds to make loans at a higher interest rate. In the end, the bank earns a profit. Defendant's role is not dissimilar. It attracts bond purchasers by issuing tax-exempt bonds, and then channels the proceeds to qualifying organizations. In this way, it fulfills its public objective by directly participating in the financial transaction.

For these reasons, plaintiffs' motion for summary judgment on the issue of § 3605's applicability to defendant will be allowed.

### B. *Sufficiency of Evidence*

Even assuming that the FHAA might be shown to apply to the transactions in question, defendant vigorously argues that the facts of record are flatly insufficient to demonstrate a violation of the statute. The argument is strong but ultimately unavailing at this stage. Plaintiffs' corresponding argument, that the undisputed facts require a finding in *their* favor, is weak and unpersuasive.

■ Plaintiffs may prove their discrimination claim in one of two ways. First, they may show merely that a particular housing practice has a discriminatory effect, or imposes a disproportionate burden, on members of protected class. *See Casa Marie,* 988 F.2d at 269 n. 20. Second, plaintiffs may present direct evidence of defendant's discriminatory intent and conduct. *Id.* Under either approach, plaintiffs must put forward enough evidence that a reasonable factfinder could decide, by a fair preponderance of the evidence, that defendant *intentionally* discriminated against NEARI's application on the basis of handicap.

■ In their motion for summary judgment, plaintiffs argue that there is conclusive direct evidence supporting their discrimination claim. On this record, however, there is a serious question whether MIFA even "denied" NEARI's application. Defendant never formally rejected the application, and even left open the possibility of reevaluating the project after NEARI had worked out several concerns. Moreover, it is undisputed that NEARI never found a purchaser for the applied-for bonds. Defendant claims that it does not grant final approval to a project until the applicant has located a buyer for the bonds. Thus, the existence of any violation of the act will be hotly contested at trial. Plaintiffs' motion for summary judgment must be denied.

A more serious question is whether defendant has pointed to fatal deficiencies in plaintiffs' case at this stage. Plaintiffs argue that defendant's requirement that NEARI satisfy community concerns was impossible and unwarranted—and a discriminatory act in itself under the FHAA. This argument assumes, among other things, that discriminatory fears held by some members of the community motivated defendant's actions, that defendant's expressions of concern over NEARI's financial stability and the project's impact on municipal services were pretextual, and that defendant's commitment to a fair reevaluation of the project at a future date was not offered in good faith.

The plaintiffs' argument assumes a great deal, but not, at least at this stage, too much. Taking the facts in the light most favorable to plaintiffs—the apparent "smooth sailing" of the project before the April 26 hearing, the arguably discriminatory nature of the local opposition to the project at that hearing, and the defendant's request for additional information after April 26—the court must conclude that a reasonable factfinder could resolve factual disputes in favor of plaintiffs and find in their favor. The case will come down to questions of credibility and fair in-

**30**

ference. Defendant's motion for summary judgment will therefore be denied.

### C. *Damages*

Defendant also seeks summary judgment on the issue of damages. Plaintiffs' submissions are adequate to put this issue in play, even disregarding the additional expert testimony. Defendant's motion will be denied on this issue.

### VI. CONCLUSION

For the foregoing reasons, plaintiffs' motion for partial summary judgment is ALLOWED in part, as follows: the proposed residential school constituted a "dwelling" for purposes of 42 U.S.C. § 3602(b); the students at issue were "handicapped" within the meaning of 42 U.S.C. § 3602(h); and both 42 U.S.C. §§ 3604(f)(1) and 3605 apply to the transactions described in the record. Plaintiffs' motion is otherwise denied. Defendant's cross-motion for summary judgment and motions to strike are DENIED.

A separate order will issue.