2016 IL App (1st) 143592

No. 1-14-3592

FIFTH DIVISION
March 31, 2016

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE *ex rel*. LISA MADIGAN, Attorney General of Illinois, | ) ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 11 CH 33666 |
| MATTHEW WILDERMUTH, GEORGE KLEANTHIS, Individually and as Managing Member of Legal Modification Network, LLC, and LEGAL MODIFICATION NETWORK, LLC, | ) ) ) ) ) | Honorable |
| Defendants-Appellants. | ) ) | Diane J. Larsen, Judge Presiding. |

_____

JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice Gordon concurred in the judgment and opinion.

**O P I N I O N**

¶ 1    This appeal presents a certified question that deals with the pleading requirements for the Attorney General of Illinois for a claim under section 3-102(B) of the Illinois Human Rights Act (Act) (775 ILCS 5/3-102(B) (West 2010)). Specifically the Attorney General filed a complaint alleging, *inter alia*, that defendants Matthew Wildermuth, George Kleanthis, and Legal Modification Network, LLC (LMN) violated section 3-102(B) of the Act by engaging in a real estate transaction and, because of unlawful discrimination, altering the terms, conditions, or

privileges of the real estate transaction or the furnishing of facilities or services in connection therewith. The Attorney General also alleged the defendants intentionally targeted their predatory practices against minorities by aiming their advertising at African-Americans and Latinos. The circuit court denied defendants' motion to dismiss this claim. After also denying defendants' motion to reconsider, the court certified the following question for interlocutory appeal under Illinois Supreme Court Rule 308 (eff. Feb. 26, 2010):

> "Whether the State may claim a violation under the [Act] pursuant to a reverse redlining theory where it did not allege that the defendant acted as a mortgage lender."

¶ 2    For the reasons that follow, we answer the certified question in the affirmative.

¶ 3                                      I.   BACKGROUND

¶ 4    The Attorney General filed its original complaint against defendants in September 2011 and subsequently filed a four-count fourth-amended complaint, which alleged the defendants had engaged in a course of conduct that violated several statutory and regulatory provisions. Count IV, (which is the only count that concerns us here) alleged that defendants Wildermuth, an attorney, and Kleanthis, a veteran of the real estate business and the sole managing member of LMN, engaged in acts and practices that violated section 3-102(B) of the Act and constituted a pattern and practice of discrimination when they partnered to offer loan modification services to Illinois consumers. Eventually, LMN ceased functioning and Wildermuth and Kleanthis provided the loan modification services through Wildermuth's law offices. The Attorney General alleged defendants engaged in "real estate transactions" as defined by section 3-101(B) of the Act by claiming to negotiate loan modifications and short sales on behalf of their clients.

¶ 5     The Attorney General alleged that after the collapse of the housing market, the federal government largely created the loan modification market through a number of programs designed to assist delinquent and underwater homeowners avoid foreclosure. However, unscrupulous private, for-profit enterprises proliferated and seized on consumer confusion and desperation, often targeted minority homeowners, and falsely offered guarantees on loan modifications and charged exorbitant and nonrefundable fees for services the enterprises could not perform.

¶ 6     The Attorney General alleged defendants advertised on radio that they would succeed where other loan modification providers had failed, help consumers save their homes and obtain significant reductions on their monthly mortgage payments, and obtain modifications for consumers within a short time frame. Consumers who contacted defendants were scheduled for meetings with nonattorneys at defendants' Woodridge, Illinois office and given aggressive sales pitches. Defendants' intake and sales staff made unreasonable assurances about defendants' likelihood of successfully modifying the consumers' mortgage loans, including promises to reduce the consumers' monthly mortgage payments by a specific amount and in a specific period of time. However, despite their broad assurances, defendants' services consisted primarily of merely filling out and submitting the paperwork to apply for a traditional affordable home loan modification program.

¶ 7     The Attorney General alleged defendants failed to provide any of the disclosures and notices mandated by the Illinois Mortgage Rescue Fraud Act (765 ILCS 940/1-1 *et seq*. (West 2010)) or the federal Mortgage Assistance Relief Services Rule (12 C.F.R. § 1015.1 *et seq*. (2012)) and charged consumers nonrefundable fees that ranged from $3,000 to $5,000, which often exceeded the consumers' monthly mortgage payments. The consumers paid the fees in advance of receiving services and were led to believe that a portion of their payments would be refunded if

defendants failed to obtain a loan modification. Defendants routinely required and accepted advance payments from consumers whom defendants knew were not eligible for loan modifications because defendants knew the consumers did not meet the basic eligibility requirements under the affordable home loan modification program. When defendants obtained loan modifications for consumers, the modifications often were either inconsistent with the promised terms or not obtained within the promised time frame. When defendants were not able to obtain a loan modification, they would suggest listing the consumer's property as a short sale. When a consumer requested a refund, in most cases defendants refused to tender a refund.

¶ 8    The Attorney General alleged defendants intentionally discriminated in the furnishing of facilities or services in connection with real estate transactions on the basis of race and national origin by targeting the African-American and Latino communities. Defendants' actions in targeting disproportionately subjected African-American and Latino homeowners to defendants' fraudulent scheme and resulted in the loss of thousands of dollars and, in many cases, the loss of homes. Defendants' discriminatory acts involving targeting included: (1) the exclusive advertisement of their services through radio stations known to have a predominantly Latino or African-American audience; and (2) the use of a well-known radio personality in the African-American community to promote defendants' services, which were carelessly or never performed. Defendants' scheme affected African-American and Latino homeowners who, in an effort to save their homes, gave defendants thousands of dollars without receiving any of the benefits defendants claimed to be able to provide.

¶ 9    Defendants moved to dismiss count IV of the fourth-amended complaint under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2012)), asserting the complaint failed to state a violation of section 3-102(B) of the Act because Wildermuth rendered legal

services and was not engaging in real estate transactions as defined in the Act. Defendants also asserted the Attorney General failed to allege facts showing that defendants treated African-Americans or Latinos differently than other groups.

¶ 10    In response, the Attorney General asserted defendants engaged in real estate transactions within the meaning of the Act when they negotiated loan modifications and short sales on behalf of consumers. Furthermore, the Attorney General, citing reverse redlining cases involving the federal fair housing statute, asserted it was not necessary to show disparate treatment or impact because the Attorney General alleged facts showing direct evidence that defendants intentionally targeted predatory practices against minorities, specifically, radio advertising aimed at African-Americans and Latinos.

¶ 11    The trial court denied defendants' motion to dismiss, concluding they functioned as mortgage brokers when they conducted short sale negotiations and sought loan modifications. Thereafter, defendants moved the court to reconsider the denial or certify a question to this court for interlocutory review. The trial court denied the motion to reconsider but certified for review the following question:

> "Whether the State may claim a violation under the [Act] pursuant to a reverse redlining theory where it did not allege that the defendant acted as a mortgage lender."

Over the Attorney General's objection, this court granted defendants' application for leave to appeal.

¶ 12                                II.   ANALYSIS

¶ 13    Illinois Supreme Court Rule 308 (eff. Feb. 26, 2010) allows for a permissive appeal of an interlocutory order certified by the trial court involving a question of law as to which there is

substantial ground for difference of opinion and where an immediate appeal may materially advance the ultimate termination of the litigation. *Brookbank v. Olson,* 389 Ill. App. 3d 683, 685 (2009). However, the rule was not intended to be a mechanism for expedited review of an order that merely applies the law to the facts of a particular case. *Walker v. Carnival Cruise Lines, Inc.,* 383 Ill. App. 3d 129, 133 (2008); *Morrissey v. City of Chicago,* 334 Ill. App. 3d 251, 258 (2002). Nor does it permit us to review the propriety of the order entered by the lower court. *Walker,* 383 Ill. App. 3d at 133. Rather, we limit our review to answering the specific question certified by the trial court to which we apply a *de novo* standard of review. See *Moore v. Chicago Park District,* 2012 IL 112788, ¶ 9.

¶ 14    The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent. *DeLuna v. Burciaga,* 223 Ill. 2d 49, 59 (2006). The language of the statute is the best indication of legislative intent, and we give that language its plain and ordinary meaning. *Ready v. United/Goedecke Services, Inc.,* 232 Ill. 2d 369, 375 (2008). In determining the plain meaning of a statute's terms, we consider the statute in its entirety, keeping in mind the subject it addresses, and the apparent intent of the legislature in enacting the statute. *Ready,* 232 Ill. 2d at 375. We may not depart from the plain language of the statute by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent. *Town & Country Utilities, Inc. v. Illinois Pollution Control Board,* 225 Ill. 2d 103, 117 (2007). "[A] court should not attempt to read a statute other than in the manner in which it was written." *Ultsch v. Illinois Municipal Retirement Fund,* 226 Ill. 2d 169, 190 (2007).

¶ 15    The Act states that it is the public policy of Illinois to "secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, order of protection status, marital status, physical or

mental disability, military status, sexual orientation, pregnancy, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations." 775 ILCS 5/1-102 (West 2014). Because the Act is remedial legislation, it must be construed liberally to give effect to its purposes. *Arlington Park Race Track Corp. v. Human Rights Comm'n*, 199 Ill. App. 3d 698, 703 (1990). Illinois courts interpreting the terms of section 3-102(B) of the Act have looked to federal case law interpreting comparable provisions the federal Fair Housing Act (FHA) (42 U.S.C. §§ 3601-3631 (2006)), and other civil rights statutes. See *Szkoda v. Human Rights Comm'n*, 302 Ill. App. 3d 532, 539-40 (1998) (examining relevant federal law to determine what constitutes sexual harassment under section 3-102(B) of the Act, which has close parallels to section 3604 of the FHA).

¶ 16    Section 3-102(B) of the Act states, in relevant part, as follows:

"Civil Rights Violations; Real Estate Transactions. It is a civil rights violation for an owner or any other person engaging in a real estate transaction, or for a real estate broker or salesman, because of unlawful discrimination or familial status, to

***

(B) Terms. Alter the terms, conditions or privileges of a real estate transaction or in the furnishing of facilities or services in connection therewith[.]" 775 ILCS 5/3-102(B) (West 2010).

¶ 17    Section 3-101 of the Act contains the following definitions:

"(B) Real Estate Transaction. 'Real estate transaction' includes the sale, exchange, rental or lease of real property. 'Real estate transaction' also includes the brokering or appraising of residential real property and the making or purchasing of loans or providing other financial assistance:

(1) for purchasing, constructing, improving, repairing or maintaining a

dwelling; or

(2) secured by residential real estate.

\*\*\*

(D) Real Estate Broker or Salesman. "Real estate broker or salesman"

means a person, whether licensed or not, who, for or with the expectation of

receiving a consideration, lists, sells, purchases, exchanges, rents, or leases real

property, or who negotiates or attempts to negotiate any of these activities, or who

holds himself or herself out as engaged in these." 775 ILCS 5/3-101(B), (D) (West

2010).

¶ 18      Because we are limiting our review to the certified question, we discuss only the

parties' arguments on appeal that are relevant to the certified question. Defendants contend

the conduct alleged by the Attorney General does not technically constitute reverse

redlining because defendants did not extend credit or influence the terms and conditions of

credit to the consumers in the first instance. According to defendants, reverse redlining is a

viable theory where the alleged discriminator controlled or influenced the terms and

conditions under which borrowers were extended credit and those terms and conditions

were predatory and unfair. Defendants, however, represented homeowners who had

already procured credit to obtain their homes and to whom no new credit was extended.

¶ 19      To support their argument, defendants cite federal cases involving actions under the

FHA against mortgage companies that have described redlining as " 'the practice of

denying the extension of credit to specific geographic areas due to the income, race, or

ethnicity of its residents.' " *Hargraves v. Capital City Mortgage Corp.*, 140 F. Supp. 2d 7,

20 (D.D.C. 2000) (quoting *United Cos. Lending Corp. v. Sargeant*, 20 F. Supp. 2d 192, 203 n.5 (D. Mass. 1998)). The term "redlining" is derived from the actual practice of drawing a red line around designated areas in which credit is to be denied. *Sargeant*, 20 F. Supp. 2d at 203 n.5. Reverse redlining has been described as " 'the practice of extending credit on unfair terms to those same communities.' " *Hargraves*, 140 F. Supp. 2d at 20 (quoting *Sargeant*, 20 F. Supp. 2d at 203 n.5).

¶ 20    Defendants argue that in order to allege discrimination under the Act pursuant to a reverse redlining theory, the Attorney General must establish that defendants (1) engaged in lending practices and loan terms that were predatory and unfair, and (2) either intentionally targeted the consumers because of their race, or that the defendants' lending practices had a disparate impact on the basis of race. Defendants contend the Attorney General cannot meet this pleading requirement because the alleged misconduct fails to establish that defendants extended credit to any consumer and, thus, the Attorney General cannot show that defendants targeted a certain class of consumers to whom defendants extended credit on materially less favorable terms.

¶ 21    Furthermore, defendants argue the Attorney General failed to allege they extended credit to any consumer or had the opportunity to affect the terms of credit through which the consumers obtained or refinanced their residential property in any way. Defendants contend that they are not mortgage brokers and their representation of delinquent borrowers does not constitute "engaging in real estate transactions" pursuant to section 3-102(B) of the Act. Although the Attorney General alleged defendants claimed to negotiate loan modifications and short sales on behalf of clients, defendants argue the Attorney General failed to allege any facts to suggest defendants acted in the capacity of a mortgage broker. Defendants also argue that the conduct alleged by the Attorney

General does not bring defendants within the section 3-101(B) definition of a real estate transaction.

¶ 22     The Attorney General argues this court should answer the certified question in the affirmative because it alleged defendants targeted distressed African-American and Latino homeowners for predatory practices with regard to mortgage loan modification services and section 3-102(B) of the Act encompasses conduct other than mortgage lending, including the negotiation and procurement of loan modifications and short sales.

¶ 23     The Attorney General argues defendants fall within the term "real estate broker or salesman" pursuant to section 3-101(D) of the Act because they held themselves out as negotiating and procuring short sales and loan modifications. According to defendants' customer agreements with the consumers, defendants stated that they would pursue various loss mitigation options, including loan restructuring and short sale payoffs. When defendants could not obtain loan modifications for their consumer clients, defendants generally suggested that the clients list the property for a short sale, which is a sale of real property for less than the amount of encumbrances on the property with the consent of the lien holders who are willing to accept less than what they are owed. See *In re Fabbro*, 411 B.R. 407, 413 n.7 (Bankr. D. Utah 2009). The Attorney General also argues defendants' conduct of negotiating loan modifications puts them within the section 3-101(D) definition of a real estate broker because a mortgage conveys an interest in real property to the mortgage lender to secure the debt created by the mortgage loan, so defendants, therefore, were negotiating sales of interests in real property.

¶ 24     The sole distinct issue raised in this interlocutory appeal is whether the Attorney General may claim a violation under the Act pursuant to a reverse redlining theory where the Attorney General did not allege that the defendants acted as mortgage lenders. Neither the Attorney General

nor defendants direct this court to, and this court is unaware of, any existing controlling law on this issue.

¶ 25    Section 3-102 of the Act requires that the entity alleged to have violated this section be either "a real estate broker or salesman" or "an owner or any other person engaging in a real estate transaction." 775 ILCS 5/3-102 (West 2010). Furthermore, the term *real estate transaction*, in addition to meaning "the sale, exchange, rental or lease of real property, *** also includes the brokering or appraising of residential real property and the making or purchasing of loans or providing other financial assistance *** for purchasing, constructing, improving, repairing or maintaining a dwelling ***." 775 ILCS 5/3-101(B)(1) (West 2010). The plain language of the statute does not require a defendant alleged to have violated section 3-102 to be a mortgage lender. To the contrary, the plain language of this section merely requires that the entity engage in a real estate transaction, which includes "providing other financial assistance *** for maintaining a dwelling." 775 ILCS 5/3-101(B)(1) (West 2010).

¶ 26    The Attorney General's amended complaint alleged that defendants offered loan modification services to consumers and utilized government programs that were designed to help delinquent and underwater homeowners avoid foreclosure. Defendants, however, allegedly made unreasonable assurances to clients about the likelihood of success in modifying the clients' home mortgage loans, carelessly or never performed the touted services, and charged the clients exorbitant and nonrefundable fees for services of little or no value. Furthermore, the Attorney General alleged defendants, because of unlawful discrimination, altered the terms, conditions or privileges in the furnishing of facilities or services in connection with real estate transactions.

¶ 27    Clearly, defendants' alleged conduct interfered with consumers' ability to obtain a particular type of financial assistance—residential loan modifications—for maintaining their

homes against the risk of foreclosure. This conduct may be construed as providing other financial assistance for maintaining a dwelling, especially in light of the allegation that defendants charged consumers fees in connection with these services. The term *other financial assistance* is not specifically defined in the Act, and section 3-102 does not require "other financial assistance" to be in the form of a mortgage loan or otherwise. The Attorney General's allegations concerning defendants' residential loan modification services are neither too far removed from transactions in the residential real estate market nor lacking any connection to the financing of residential real estate. Construing the Act—which is remedial legislation—liberally, we conclude that defendants' alleged conduct brings them within the section 3-101 definition of a *real estate transaction* as providing other financial assistance for maintaining a dwelling, and the section 3-102(B) requirement concerning the furnishing of facilities or services in connection with a real estate transaction that alters the terms, conditions or privileges of such a transaction based on unlawful discrimination.

¶ 28    We find support for this position by looking to persuasive federal case law interpreting a comparable provision of the FHA—section 3605 of the FHA—which closely parallels the language of sections 3-101 and 3-102(B) of the Act. See *Szkoda*, 302 Ill. App. 3d at 539-40. Federal courts have discussed the meaning of *financial assistance* in the context of section 3605 of the FHA. The Seventh Circuit held that property or casualty insurance did not constitute financial assistance because "[i]nsurers do not subsidize their customers or act as channels through which public agencies extend subsidies." *National Ass'n for the Advancement of Colored People v. American Family Mutual Insurance Co*., 978 F.2d 287, 297 (7th Cir. 1992). In *United States v. Massachusetts Industrial Finance Agency*, 910 F. Supp. 21, 28-29 (Mass. Dist. Ct. 1996), the court held that a quasi-public agency's action of channeling the proceeds from tax-exempt bonds to

qualifying applicant organizations was extending financial assistance to those applicants. Consistent with both *American Family* and *Massachusetts Industrial*, defendants here, although admittedly not quasi-government agencies, hold themselves out as a channel through which relief flows in the form of residential loan modifications via government programs designed to help delinquent and underwater homeowners avoid foreclosures. The terms *financial assistance* in section 3605 of the FHA and *other financial assistance* in section 3-101(B) of the Act are very similar, and we find that the discussions of financial assistance in *American Family* and *Massachusetts Industrial* support our conclusion that defendants' alleged loan modification conduct brings them within the section 3-101 definition of a *real estate transaction* as providing other financial assistance for maintaining a dwelling.

¶ 29    Furthermore, in *Eva v. Midwest National Mortgage Banc, Inc.*, 143 F. Supp. 2d 862 (N.D. Ohio 2001), the plaintiffs, female borrowers, alleged, *inter alia*, that defendants, which included a mortgage lender, its employees or agents, and a corporation—U.S. Mortgage Reduction, Inc. (USMR), violated section 3605 of the FHA by engaging in a pattern or practice of predatory and sexually discriminatory lending related to the refinancing of homes already owned by the plaintiffs. Defendant USMR moved to dismiss the claim against it, arguing, *inter alia*, that section 3605 of the FHA applied to mortgage lenders, bankers, mortgage arrangers and creditors, but did not apply to entities like USMR, which was a separate entity that merely managed and marketed a program utilized by the other defendants in their alleged predatory, discriminatory, and fraudulent mortgage refinancing scheme that extracted excessive funds from the plaintiffs. *Id*. at 872, 875, 878, 888-89. Specifically, USMR, according to the plaintiffs' allegations, had signed the plaintiffs up for the program and imposed transaction fees every time the plaintiffs made a mortgage payment. *Id*.

¶ 30    The *Eva* court rejected USMR's argument, finding that the plain language of section 3605 of the FHA did not "require a defendant to be a mortgage lender, banker, mortgage arranger or creditor." "To the contrary, *** merely require[d] that the entity conduct business which '*includes* engaging in residential real estate-related transactions.' " (Emphasis in original.) *Id*. at 889 (quoting 42 U.S.C. § 3605 (2000)). In addition, the court concluded that the term *residential real estate-related transaction* included the conduct of "providing other financial assistance for maintaining a dwelling," and applied to USMR's management of the program utilized by the lender and the other defendants. *Id*. (citing 42 U.S.C. §§ 3605(b)(1)(A)-(B) (2000)).

¶ 31    We find that the relevant provisions of the FHA discussed in *Eva* are very similar to sections 3-101 and 3-102(B) of the Act, and the alleged misconduct of defendant USMR in *Eva* has close parallels to the alleged misconduct of defendants' in the instant case. Accordingly, we reject the premise that a section 3-102(B) claim against a defendant must allege the defendant was a mortgage lender.

¶ 32    The interlocutory appeal question also asks whether the Attorney General must allege that defendants acted as mortgage lenders because the Attorney General utilized a reverse redlining theory to allege defendants engaged in unlawful discrimination by intentionally targeting on the basis of race. This issue arises because the Attorney General utilized the reverse redlining theory, *i.e.*, the intentional targeting of African-Americans and Latinos, instead of pleading facts to show unlawful discrimination by defendants based on their practices having a disparate impact on the basis of race. See *Hargraves*, 140 F. Supp. 2d at 20 (a claim against the defendant mortgage lenders for violating the FHA must show that (1) the defendants' lending practices and loan terms were unfair and predatory, and (2) the defendants either intentionally targeted on the basis of race or there was a disparate impact on the basis of race).

¶ 33    Defendants assert that although reverse redlining is a viable theory when the alleged discriminator controlled or influenced the terms and conditions under which borrowers were extended credit, reverse redlining is not applicable to situations where no new credit was extended to homeowners who had already procured credit to purchase their homes. To support this assertion, defendants cite federal cases analyzing reverse redlining theories of discrimination that involved claims of FHA violations against mortgage lenders extending credit to borrowers. In those cases, reverse redlining was described as the practice of *extending credit* on unfair terms to specific geographical areas due to the income, race or ethnicity of the communities' residents. See *Id*.

¶ 34    We reject defendants' assertion that the reverse redlining theory for proving discrimination narrowly applies only to instances involving the extension of credit. Federal courts have addressed cases that utilized the redlining or reverse redlining theories to allege discrimination in the context of claims pursuant to the FHA involving the issuance and cancellation of property insurance policies. See *Nationwide Mutual Insurance Co. v. Cisneros*, 52 F.3d 1351 (6th Cir. 1995); *American Family Mutual Insurance Co.*, 978 F.2d at 298. Furthermore, permitting evidence of intentional targeting in the context of residential loan modification services as an alternative to evidence of disparate treatment or impact is in keeping with the Act's multiple aims of forbidding practices that make housing unavailable to persons on a discriminatory basis as well as discriminatory terms and conditions with respect to housing that is provided. The Act would provide little vindication to the policy of nondiscrimination in housing if it prohibited discrimination against individuals seeking a home or credit to purchase a home, but then subsequently gave free reign to entities to discriminate against these same individuals seeking loan modification services in order to avoid foreclosure. In the context of section 3-102 of the Act,

reverse redlining is not strictly limited to the practice of mortgage lending; rather it more broadly encompasses the conduct of engaging in predatory practices with respect to services related to *real estate transactions*, as that term is broadly defined in section 3-101(D) of the Act, and directing those predatory practices against members of minority groups.

¶ 35    Defendants cite *Davis v. Wells Fargo Bank*, 685 F. Supp. 2d 838 (2010), to support the proposition that they cannot be liable under section 3-102(B) of the Act because the court in that case construed the similar language of section 3605 of the FHA as applying only to transactions involving the making or purchasing of loans. In *Davis*, the plaintiff was the victim of a predatory mortgage in 1999; in 2007, a jury found that her loan was based on fraud and awarded her a judgment against her original lender. *Id*. at 840-41. The plaintiff, however, was unable to collect the judgment after the original lender went out of business. See *Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 533 (7th Cir. 2011). Meanwhile, the plaintiff's loan was eventually assigned to a new lender and was serviced by a new loan servicer, and a foreclosure proceeding was initiated against the plaintiff when she failed to make her monthly payments. *Davis*, 685 F. Supp. 2d at 840. Thereafter, the plaintiff sued the new lender and loan servicer, alleging, *inter alia*, that they violated section 3605 of the FHA by attempting to foreclose on her home and demanding repayment of the loan and related fees despite a court finding that the loan was fraudulent. *Id*.

¶ 36    The district court granted summary judgment in favor of the defendant loan lender and servicer, stating that the plaintiff failed to present any legal argument to support her section 3605 claim. *Id*. at 844. The district court then noted that the defendants did not directly enter into or refuse to enter into any loan with the plaintiff and summarily concluded that section "3605 applies only to transactions involving the 'making or purchasing of loans.' " *Id*. (quoting 42 U.S.C. § 3605(a) (2009) and citing two unpublished district court cases). In reaching this conclusion, the

district court failed to discuss or analyze the specific language of section 3605 that provides an entity may be liable for providing other financial assistance for improving, repairing, or maintaining a dwelling. See 42 U.S.C. § 3605(b)(1)(a) (2009). When the Seventh Circuit affirmed the judgment of the district court on appeal, the Seventh Circuit did not review the district court's decision concerning the plaintiff's section 3605 claim because she had abandoned any section 3605 claim. *Estate of Davis*, 633 F.3d at 539 n.3.

¶ 37    This court is not bound by the federal district court's holding in *Davis*, and it does not change our analysis. The *Davis* court did not address the statutory language concerning *providing other financial assistance for maintaining a dwelling*, which is central to our holding in the instant case. Furthermore, *Davis* is inapposite because the plaintiff forfeited her section 3605 claim and the defendants did not directly engage in any transaction with her, either for the original mortgage or the refinanced mortgage, and their involvement with her occurred merely in the context of a foreclosure proceeding years after other entities had procured the fraudulent loan. Here, in contrast, the Attorney General alleged that defendants directly engaged in real estate transactions with consumers by intentionally targeting minority homeowners for residential loan modification services, by giving the homeowners aggressive sales pitches and unreasonable assurances about defendants' ability to successfully modify the homeowners' loans, and by charging exorbitant and nonrefundable fees for services of little or no value.

¶ 38    We hold that the Attorney General may claim a violation under the Act pursuant to a reverse redlining theory even though the Attorney General did not allege that defendants acted as mortgage lenders because the concept of reverse redlining is not strictly limited to situations involving mortgage lending and section 3-102(B) of the Act broadly encompasses conduct other than mortgage lending, including the loan modification

services that defendants offered. Accordingly, we answer the trial court's certified question in the affirmative.

¶ 39                                     III.   CONCLUSION

¶ 40     For the foregoing reasons, we answer the certified question in the affirmative.

¶ 41     Certified question answered; cause remanded.