# Illinois Official Reports

## Supreme Court

---

### *People ex rel. Madigan v. Wildermuth*, 2017 IL 120763

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE *ex rel.* LISA MADIGAN, Attorney General of Illinois, Appellee, v. MATTHEW WILDERMUTH *et al.*, Appellants. |
| Docket No. | 120763 |
| Filed | September 21, 2017 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Diane L. Larsen, Judge, presiding. |
| Judgment | Appellate court judgment affirmed in part and vacated in part; cause remanded. |
| Counsel on Appeal | Robert E. Browne, Jr., and William P. Pipal, of Troutman Sanders LLP, of Chicago, and Michael T. Reagan, of Ottawa, for appellants.<br><br>Lisa Madigan Attorney General, of Springfield (David L. Franklin, Solicitor General, and John Schmidt, Assistant Attorney General, of Chicago, of counsel), for the People.<br><br>Elizabeth Shuman-Moore and Ryan Z. Cortazar, of Chicago Lawyers' Committee for Civil Rights, and William J. McKenna, Jr., and Peter J. O'Meara, of Foley & Lardner LLP, both of Chicago, for *amici curiae* Chicago Lawyers' Committee for Civil Rights Under Law, Inc., *et al.* |

Justices                 JUSTICE THOMAS delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Freeman, Kilbride, Garman, Burke, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1       This appeal presents a certified question involving the requirements necessary to maintain a civil rights claim for unlawful discrimination in connection with a "real estate transaction" under section 3-102 of the Illinois Human Rights Act (the Act) (775 ILCS 5/3-102 (West 2010)). Specifically, the Attorney General filed a complaint alleging, *inter alia*, that defendants Matthew Wildermuth, George Kleanthis, and Legal Modification Network (LMN) unlawfully discriminated on the basis of race and national origin in the furnishing of services in connection with real estate transactions. The circuit court of Cook County denied defendants' motion to dismiss brought under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2010)), but it ultimately certified the following question for interlocutory appeal to the appellate court:

> "Whether the State may claim a violation under the Illinois Human Rights Act pursuant to a reverse redlining theory where it did not allege that the defendant acted as a mortgage lender."

The appellate court answered the certified question in the affirmative. 2016 IL App (1st) 143592, ¶ 38. Defendants petitioned for leave to appeal to this court, which we allowed.

¶ 2                                     BACKGROUND

¶ 3       The Attorney General filed a multicount, fourth amended complaint against defendants, alleging a course of conduct that violated several statutory and regulatory provisions. Count IV is the only count relevant to this appeal[1] and alleges as follows. Defendants Wildermuth, an attorney, and Kleanthis, a veteran of the real estate business and the sole managing member of LMN, engaged in acts and practices that violated section 3-102 of the Act. Defendants' actions constituted a pattern and practice of discrimination in the offering of loan modification services to Illinois consumers. Eventually, LMN ceased functioning, and Wildermuth and Kleanthis provided loan modification services through Wildermuth's law offices. According to the complaint, defendants engaged in "real estate transactions" as defined by section 3-101(B) of the Act (775 ILCS 5/3-101(B) (West 2010)) by claiming to negotiate loan modifications and short sales on behalf of their clients.

¶ 4       The Attorney General further alleged that defendants advertised on radio that they would succeed where other loan modification providers had failed, help consumers save their homes

---

[1]Count I alleges violations of various provisions of the Mortgage Rescue Fraud Act (765 ILCS 940/1 *et seq.* (West 2010)), count II alleges violations of the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2010)), and count III alleges violations of federal regulations governing mortgage assistance relief services (see 12 C.F.R. § 1015 *et seq.* (2012)). These counts are currently pending before the circuit court.

and obtain significant reductions on their monthly mortgage payments, and obtain modifications for consumers within a short time frame. Defendants charged consumers nonrefundable fees that ranged from $3000 to $5000, which consisted of a base charge for preparing and submitting a loan modification application for a first lien residential mortgage, and additional fees for second liens and court appearances by Wildermuth. The total fee charged often exceeded the consumer's monthly mortgage payment. The consumers paid the fees in advance of receiving services and were led to believe that a portion of their payments would be refunded if defendants failed to obtain a loan modification. Defendants routinely required and accepted advance payments from consumers defendants knew were not eligible for loan modifications. In most cases, the consumers would not interact with Wildermuth or any other licensed attorney, and when consumers contacted LMN for an update on the status of their modification, they were either ignored or falsely told that the modification had been processed. In most cases, when a consumer requested a refund, LMN refused to tender one.

¶ 5    The complaint further alleged that despite the broad assurances given by defendants, their services consisted primarily of filling out and submitting the paperwork to apply for a traditional home loan modification program. The modifications obtained were often either inconsistent with the promised terms or not obtained within the promised time frame. When defendants were not able to obtain a loan modification, they would suggest listing the consumer's property as a short sale. The Attorney General also alleged that defendants intentionally discriminated in the furnishing of facilities or services in connection with real estate transactions on the basis of race and national origin by targeting the African-American and Latino communities by advertising their services through radio stations known to have a predominantly Latino and African-American audience.

¶ 6    Defendants filed a section 2-615 motion to dismiss count IV, asserting that the complaint failed to state a violation of section 3-102(B) of the Act because Wildermuth rendered legal services and was not engaging in "real estate transactions" as defined by the Act. In response, the Attorney General argued that defendants engaged in "real estate transactions" within the meaning of the Act when they negotiated loan modifications and short sales on behalf of consumers. The Attorney General relied on a "reverse redlining" theory to argue that defendants engaged in discrimination.[2]

¶ 7    The circuit court denied defendants' motion to dismiss, concluding that defendants' conduct was covered by the Act because they acted as "mortgage brokers" in their activities. The circuit court subsequently denied defendants' motion to reconsider, but it noted that "it would be expeditious to have the appellate court determine in the first instance—can you even state a claim." The circuit court therefore certified for review the following question:

---

[2]"Redlining" refers to the lending practice of denying credit outright to applicants in a specific geographic area due to the income, race, or ethnicity of its residents. See *Honorable v. Easy Life Real Estate System*, 100 F. Supp. 2d 885, 892 (N.D. Ill. 2000); *United Companies Lending Corp. v. Sargeant*, 20 F. Supp. 2d 192, 203 n.5 (D. Mass. 1998) (the term was derived from the actual practice of drawing a red line on a map around certain areas in which credit would be denied). "Reverse redlining," on the other hand, involves the extension of credit to consumers but on terms that are materially less favorable than to similarly situated consumers outside the "red line." Federal courts have recognized that reverse redlining violates civil rights laws, including the federal Fair Housing Act (FHA) (42 U.S.C. § 3601 *et seq.* (2006)). See *Honorable*, 100 F. Supp. 2d at 892.

"Whether the State may claim a violation of the [Act] pursuant to a reverse redlining theory where it did not allege that the defendant acted as a mortgage lender."

¶ 8 The appellate court answered the question in the affirmative, holding that "the concept of reverse redlining is not strictly limited to situations involving mortgage lending and section 3-102(B) of the Act broadly encompasses conduct other than mortgage lending, including the loan modification services that defendant offered." 2016 IL App (1st) 143592, ¶ 38. The appellate court did not directly address the circuit court's ruling that defendants' alleged activities suggested they were mortgage brokers.[3] In reaching its holding, the appellate court made three findings relative to the parties' arguments on the certified question. First, the appellate court found that the plain language of section 3-102 does not require a defendant alleged to have violated the statute to be a mortgage lender. To the contrary, the plain language merely requires that the entity engage in a "real estate transaction," which is defined in pertinent part to include " 'providing other financial assistance *** for maintaining a dwelling.' " *Id.* ¶ 25 (quoting 775 ILCS 5/3-101(B)(1) (West 2010)). Second, the appellate court turned to the question of whether defendants provided *other financial assistance for maintaining a dwelling* so as to bring their conduct within the definition of "real estate transaction" under the statute. The appellate court concluded that defendants' loan modification services are sufficiently connected to the financing of residential real estate so that they can be considered *other financial assistance*. *Id.* ¶ 28. For this conclusion, the appellate court looked to federal case law construing language in the federal Fair Housing Act (FHA) (42 U.S.C. § 3601 *et seq.* (2006)) that is substantially similar to the pertinent provisions of the Illinois Act. 2016 IL App (1st) 143592, ¶ 28. Specifically, the appellate court discussed *National Ass'n for the Advancement of Colored People v. American Family Mutual Insurance Co.*, 978 F.2d 287, 297 (7th Cir. 1992) (*American Family Mutual*) (property insurance does *not* constitute "financial assistance" within the meaning of section 3605 of the FHA (42 U.S.C. § 3605 (1988))), *United States v. Massachusetts Industrial Finance Agency*, 910 F. Supp. 21, 28-29 (D. Mass. 1996) (a quasi-public agency's channeling of proceeds from tax-exempt bonds to qualifying applicants was considered "financial assistance"), and *Eva v. Midwest National Mortgage Banc, Inc.*, 143 F. Supp. 2d 862 (N.D. Ohio 2001) (the "financial assistance" language of section 3605 of the FHA applied to an entity that marketed and managed a mortgage refinancing scheme used by other defendants to defraud the plaintiffs). Third, the appellate court rejected defendants' assertion that the reverse redlining theory for proving discrimination applies only to instances involving the extension of credit. 2016 IL App (1st) 143592, ¶ 34.

¶ 9 Defendants filed a petition for leave to appeal, which this court allowed.

¶ 10                                                      ANALYSIS

¶ 11 Before this court, defendants argue that the lower courts misinterpreted the applicable statutory language to determine that defendants either engaged in "real estate transactions" or were acting as "mortgage brokers." We note that the full scope of the issues presented in this

---

[3]The Attorney General's office in its brief before this court likewise does not defend or even address the circuit court's conclusion that defendant's alleged activities amounted to mortgage brokering. The Attorney General's complaint also does not allege that defendants were mortgage brokers. Nor does it allege that they were mortgage lenders.

case goes beyond the narrow question certified by the circuit court, and in such cases, this court's review is not limited solely to consideration of the certified question (*Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 153 (2007)). In the interests of judicial economy and the need to reach an equitable result, we may delve further to resolve the related issues of law that ultimately control the propriety of the order that gave rise to the appeal. See *Johnston v. Weil*, 241 Ill. 2d 169, 175 (2011); *De Bouse v. Bayer AG*, 235 Ill. 2d 544, 550 (2009). The parties' arguments involve the construction of a statute, which is a question of law that we review *de novo*. *In re Andrew B.*, 237 Ill. 2d 340, 348 (2010).

¶ 12    Section 3-102 of the Act is titled "Civil Rights Violations; Real Estate Transactions" and provides in relevant part as follows:

"It is a civil rights violation for an owner or any other person engaging in a real estate transaction, or for a real estate broker or salesman, because of unlawful discrimination or familial status, to

(A) Transaction. Refuse to engage in a real estate transaction with a person or to discriminate in making available such a transaction;

(B) Terms. Alter the terms, conditions or privileges of a real estate transaction or in the furnishing of facilities or services in connection therewith[.]" 775 ILCS 5/3-102 (West 2010).

¶ 13    Section 3-101 of the Act provides the following definitions for the terms "real estate transaction" and "real estate broker or salesman":

"(B) *** 'Real estate transaction' includes the sale, exchange, rental or lease of real property. 'Real estate transaction' also includes the brokering or appraising of residential real property and the making or purchasing of loans *or providing other financial assistance*:

(1) *for* purchasing, constructing, improving, repairing or *maintaining a dwelling*; or

(2) secured by residential real estate.

***

(D) *** 'Real estate broker or salesman' means a person, whether licensed or not, who, for or with the expectation of receiving a consideration, lists, sells, purchases, exchanges, rents, or leases real property, or who negotiates or attempts to negotiate any of these activities, or who holds himself or herself out as engaged in these." (Emphases added.) 775 ILCS 5/3-101(B), (D) (West 2010).

¶ 14                                    I. *Financial Assistance*

¶ 15    The Attorney General first argues that defendants were engaged in real estate transactions because they provided "other financial assistance" to distressed homeowners for purposes of "maintaining a dwelling" as set forth in section 3-101(B) of the Act. The Attorney General contends that the phrase "other financial assistance" in that section should be construed liberally to include defendants' business model of assisting consumers with applying for loan modifications.

¶ 16    In response, defendants argue that they did not provide any "financial assistance" that could be considered to fall within the plain meaning of the Act. They point out that section

3-101(B) of the Illinois Act is modeled after section 3605(b)(1) of the federal FHA (42 U.S.C. § 3605(b)(1) (2006)), there is little or no Illinois precedent interpreting Illinois's Act, and in such cases, a court construing Illinois's Act should look to federal decisions interpreting similar language in the FHA (see, *e.g.*, *Szkoda v. Illinois Human Rights Comm'n*, 302 Ill. App. 3d 532, 539-40 (1998)). Defendants note that nearly every federal court that has construed the counterpart phrase "loans or providing other financial assistance" found in section 3605(b)(1) of the federal statute has concluded that its application is limited to circumstances where the defendants were lenders or appraisers of mortgage loans or affiliates of the lender collecting the loan payments and, thus, had the ability to affect the terms on which credit is extended to the borrower. See, *e.g.*, *American Family Mutual*, 978 F.2d at 297; *Davis v. Fenton*, 26 F. Supp. 3d 727, 741 (N.D. Ill. 2014); *Davis v. Wells Fargo Bank*, 685 F. Supp. 2d 838, 844 (N.D. Ill. 2010); *Walton v. Diamond*, No. 12-cv-4493, 2013 WL 1337334 (N.D. Ill. Mar. 29, 2013); *Jones v. Countrywide Home Loans, Inc.*, No. 09 C 4313, 2010 WL 551418, at *7 (N.D. Ill. Feb. 11, 2010).

¶ 17    When construing a statute, this court's fundamental objective is to ascertain and give effect to the intent of the legislature. *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 52. The most reliable indicator of legislative intent is the statutory language itself, giving it its plain and ordinary meaning. *People v. Perry*, 224 Ill. 2d 312, 323 (2007). In determining the plain meaning of statutory terms, we consider the statute in its entirety, keeping in mind the subject it addresses and the apparent intent of the legislature in enacting it. *Id.* Words and phrases should not be construed in isolation but must be interpreted in light of other relevant provisions of the statute. *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 504 (2000). Similarly, the meaning of questionable words or phrases in a statute should be ascertained by reference to the meaning of the surrounding words and phrases. *Hayes v. Mercy Hospital & Medical Center*, 136 Ill. 2d 450, 477 (1990) (Calvo, J., dissenting, joined by Ward and Clark, JJ.). When addressing the meaning of an undefined statutory term, it is the responsibility of the court to choose a dictionary definition that most effectively conveys the intent of the legislature. *Gaffney v. Orland Fire Protection District*, 2012 IL 110012, ¶ 95 (Garman, J., concurring in part and dissenting in part, joined by Thomas and Karmeier, JJ.).

¶ 18    We begin our analysis with an examination of the statutory language itself. The Act does not define the term "other financial assistance," and it must be read in context with the surrounding statutory language. We note that the term is preceded by the words "the making or purchasing of loans" and is succeeded by the phrase "for purchasing, constructing, improving, repairing or maintaining a dwelling." See 775 ILCS 5/3-101(B)(1) (West 2010). Read in context then, the "other financial assistance" contemplated by the legislature appears to be the providing of funds for making or purchasing a loan for the initial acquisition or construction or the subsequent upkeep, repair, or improvement of the property. The statute does not impose liability for any form of "assistance" that defendants may have undertaken. Rather, liability exists for providing "*financial* assistance" in a discriminatory manner. Webster's Third New International Dictionary defines "financial" as "relating to finance." Webster's Third New International Dictionary 851 (1993). "Finance," under the dictionary definition most relevant to the subject and purpose of the statute, means "to provide with necessary funds in order to achieve a desired end <[finance] a son through school> <[financed] the government through this emergency>." *Id.*

- 6 -

¶ 19 Here, defendants are alleged to have provided assistance with filling out paperwork for modifications to already-existing loans. There is no allegation that defendants themselves provided any funds to their clients in order to achieve the desired end of obtaining a loan modification. In fact, it is indisputable that no new credit is extended when a loan is modified. Nor is there any allegation that defendants were affiliated or in the pipeline with any entity that provided funds.

¶ 20 There is also no reason to believe, based on the allegations of the complaint, that the purpose of any assistance rendered by defendants was for "maintaining a dwelling," as is required by section 3-101(B)(1). 775 ILCS 5/3-101(B)(1) (West 2010). The statutory language must be read in context, and it provides that the financial assistance must be for "purchasing, constructing, improving, repairing, or maintaining a dwelling." *Id.* Our understanding of the word "maintaining" is informed by the verbs preceding it (*i.e.*, constructing, improving, repairing). Among the definitions offered by Webster's Third New International Dictionary for "maintenance" is "keeping something (as buildings or equipment) in a state of repair or efficiency." Webster's Third New International Dictionary 1362 (1993). This, we believe, is the definition the legislature intended when we consider the linking of the word "maintaining" with the verbs directly preceding it—"improving" and "repairing." In our view, the most plausible definition of "maintaining" conveys the sense of keeping property in a state of repair, not simply preventing it from being foreclosed upon, as the Attorney General suggests.[4] Accordingly, we reject the State's argument that, based on the allegations of the complaint, defendants engaged in a "real estate transaction" within the meaning of the statute by providing "financial assistance for *** maintaining a dwelling."

¶ 21 Our holding is consistent with federal case law interpreting the cognate provisions contained in section 3605(b)(1)(A) of the FHA, which defines "real estate-related transaction" in part as "[t]he making or purchasing of loans or providing *other financial assistance *** for *** maintaining a dwelling.*" (Emphasis added.) 42 U.S.C. § 3605(b)(1)(A) (2006). Numerous cases have held that this language is limited in application to circumstances where the defendants had the ability to affect the terms on which credit is extended to the borrower, such as where the defendants were lenders, brokers, or appraisers of mortgage loans or affiliates of the lender collecting the loan payments. See, *e.g.*, *American Family Mutual*, 978 F.2d at 297; *Davis v. Fenton*, 26 F. Supp. 3d at 741 ("section 3605 applies only to transactions involving defendants that are lenders, brokers, or appraisers of mortgage loans"); *Davis v. Wells Fargo Bank*, 685 F. Supp. 2d at 844 (section 3605 applies only to transactions involving the making or purchasing of loans); *Walton*, 2013 WL 1337334 (held that section 3605 did not apply to defendant contractor and its home repair contract because that section only applies to the making or purchasing of loans); *Jones*, 2010 WL 551418, at *7 (held that the defendant closing

---

[4]Webster's defines "maintain" as "1. To carry on: continue <maintain a sound economy> 2. To keep in a desirable condition <maintain bridges> 3. To provide for *** 4. To defend, as against attack or danger. 5. To declare: assert." Webster's II New Riverside Dictionary 420 (1984). We believe that the second definition is the sense that the legislature had in mind when using it in the statute before us. See also Black's Law Dictionary 1039 (9th ed. 2009) (one of several definitions offered for "maintain" is to "care for (property) for purposes of operational productivity or appearance; to engage in general repair and upkeep").

agent was not liable under section 3605(b)(1) because the defendant was not the lender of the mortgage loan and did not "provide any other financial assistance in the transaction").

¶ 22    To reach its contrary conclusion that defendant's conduct—in filling out paperwork for the loan modification process and recommending short sales—amounted to "financial assistance" for maintaining a dwelling, the appellate court relied upon *Eva*, 143 F. Supp. 2d 862, *American Family Mutual*, 978 F.2d at 297, and *Massachusetts Industrial*, 910 F. Supp. at 28-29. We find these cases to be easily distinguishable.

¶ 23    In *Eva*, defendant U.S. Mortgage Reduction, Inc. (USMR), was an affiliate of the lender. USMR managed and advertised a loan acceleration program, under which USMR collected one additional payment a year from plaintiffs and USMR profited directly from the loan by pocketing the fees charged in connection with the acceleration program. The *Eva* court found the allegation that USMR manages the acceleration program to be sufficient alone to satisfy the statutory language of providing financial assistance to maintain a dwelling. The court also found it significant that USMR's acceleration agreement misrepresented the terms of the loan. The court concluded that "USMR is not too far removed from transactions in the commercial residential market, nor is it lacking in any connection to the financing of residential real estate, as to warrant dismissal of [p]laintiffs' § 3605 claim." *Eva*, 143 F. Supp. 2d at 889.

¶ 24    In contrast to *Eva*, the Attorney General in the present case did not allege that defendants were affiliated with any lender or bank. Nor was it alleged that defendants misrepresented the terms of a loan they managed. Instead, defendants were outside the actual pipeline of the loan process as far as the decision-making on the terms and conditions of any loan or loan modification. In fact, defendants in the present case actually represented their clients *against* the lenders in the process of dealing with their arrears on their mortgages, albeit in such a way as to allegedly deceive and defraud their clients. But this does not amount to a violation of sections 3-101 and 3-102 of the Act.

¶ 25    Another federal case relied upon by the appellate court, *American Family Mutual*, 978 F.2d 287, also does not help the Attorney General's position. There, the Court of Appeals, Seventh Circuit, held that it would strain the "language [of section 3605] past the breaking point to treat [the sale of] property or casualty insurance as 'financial assistance'—let alone as assistance 'for purchasing … a dwelling.' " *Id.* at 297. In reaching this holding, the court reasoned as follows:

> "Insurers do not subsidize their customers or act as channels through which public agencies extend subsidies. They do not 'assist' customers even in the colloquial sense that loans are 'assistance' (a lender advances cash, with repayment deferred). *Payment runs from the customer to the insurer*. Insurance is no more 'financial assistance' than a loaf of bread purchased at retail price in a supermarket is 'food assistance' or a bottle of aspirin brought from a druggist is 'medical assistance.' " (Emphasis added.) *Id.*

¶ 26    In the case before us, the appellate court seized upon the language from *American Family Mutual*, which states that " '[i]nsurers do not subsidize their customers or act as channels through which public agencies extend subsidies.' " 2016 IL App (1st) 143592, ¶ 28 (quoting *American Family Mutual*, 978 F.2d at 297). The appellate court believed that defendants "hold themselves out as a channel through which relief flows in the form of residential loan modifications via government programs designed to help delinquent *** homeowners avoid foreclosures." *Id.*

- 8 -

¶ 27     We disagree, however, that defendants were channels through which funds flow to the extent contemplated by *American Family Mutual*. Defendants were clearly not a *necessary* and direct channel through which funds flow.

¶ 28     The appellate court also found it significant that defendants' alleged conduct indicated that they "interfered with consumers' ability to obtain a particular type of financial assistance—residential loan modifications." *Id.* ¶ 27. But it is hard to fathom how "interfering" with someone's ability to obtain financial assistance is the same thing as "providing" financial assistance. Defendants were no more a necessary channel through which funds flow (*i.e.*, financial assistance) than a druggist is a channel through which drugs flow (*i.e.*, medical assistance), and therefore accepting the appellate court's interpretation would be, in the words of *American Family Mutual*, to "strain [the] language [of the statute] past the breaking point." *American Family Mutual*, 978 F.2d at 297.

¶ 29     The appellate court also relied upon *Massachusetts Industrial*, 910 F. Supp. 21, to support its conclusion. There, the defendant was a quasi-public agency that issued tax-exempt bonds for qualifying organizations after application. After the bonds were sold, it issued the proceeds to the qualifying organizations. *Id.* at 29. The defendant was a "necessary conduit" through which money to others flowed and was a direct participant in the financial transaction. *Massachusetts Industrial* distinguished *American Family Mutual* by stating, "[a]n insurer does not provide a necessary conduit through which funds flow; the defendant here does." *Id.* at 28.

¶ 30     We have already determined that defendants' services here cannot be considered necessary, and defendants are not "necessary conduits" through which funds flow. Nor are they a quasi-public agency. *Massachusetts Industrial* is thus readily distinguishable from the present case.

¶ 31     Of the cases cited by the parties before this court, the one that comes closest to the facts of this case is *Davis v. Fenton*, 26 F. Supp. 3d 727. There, the defendant provided legal services to the plaintiff client who was being foreclosed upon by a mortgage company. The parties' retainer agreement outlined the scope of representation and included such matters as reviewing loan documents and negotiating with the mortgagee. *Id.* at 734. The main issue in the case had to do with the enforceability of an arbitration clause in the retainer agreement. In deciding that issue, however, the court considered whether defendant's conduct included "real-estate related transactions" within the meaning of section 3605 of the FHA. The court concluded that it did not. It found that the "[d]efendants are not lenders, brokers, or appraisers, and so [p]laintiff's attempt to bring a claim against them under section 3605 is misguided." *Id.* at 741. In reaching its conclusion, the *Fenton* court quoted the holding of *Jones*, 2010 WL 551418, at *7, with approval as follows: "section 3605 did not apply to defendant because defendant 'was neither the lender, nor the broker, nor the appraiser of [plaintiff's] mortgage loan, nor did it provide any other financial assistance in the transaction.' " *Davis v. Fenton*, 26 F. Supp. 3d at 741.

¶ 32     We agree with the appellate court that, under the Act, it is not necessary to allege that one is a mortgage lender to sustain a claim for a violation of the statute. We find, however, that the grounds relied upon here with respect to the "other financial assistance" language were lacking. There is also no support for the circuit court's decision to deny defendants' motion to dismiss on the basis that defendants' alleged activities indicated that they were in violation of the Act because they were "mortgage brokers," and the Attorney General does not argue

otherwise in the appeal before us.

¶ 33                                    II. *Real Estate Broker*

¶ 34        As an alternative argument, the Attorney General claims that there is a second way that liability may attach under the Act to defendants' conduct. According to the Attorney General, because defendants held themselves out as negotiating short sales, they are considered "real estate brokers" under section 3-101(D) of the Act (775 ILCS 5/3-101(D) (West 2010)).

¶ 35        The problem with the Attorney General's argument is that even if we accept that defendants were "real estate brokers" for purposes of the statute, they would still have to engage in a "real estate transaction" as defined by section 3-101(B) for liability to attach. Under the plain language of the statute, a person who negotiates the sale of real property or who merely holds himself out as negotiating the sale is considered a "real estate broker." See 775 ILCS 5/3-101(D) (West 2010). Defendants, therefore, can arguably be considered real estate brokers within the meaning of the statute for holding themselves out as willing and able to work with banks to negotiate short sales. But it does not necessarily follow that defendants have engaged in a "real estate transaction," and it is only real estate brokers who have engaged in a "real estate transaction" who are potentially liable under the statute. In other words, it is not enough to invoke liability if a defendant is merely a real estate broker; instead, he must be a real estate broker that, because of unlawful discrimination, alters the terms of a real estate transaction, which is defined in relevant part as the actual "brokering *** of residential real property." See 775 ILCS 5/3-101(B) (West 2010).

¶ 36        Here, there is no allegation in the complaint that defendants actually brokered any short sales. The complaint merely alleges that defendants "recommended" or "suggested" short sales and claimed to be able to negotiate them. Nor is there any allegation in the complaint that defendant altered any terms or services in connection with a short sale because of unlawful discrimination. Under these circumstances, we reject the Attorney General's argument that the ruling on the motion to dismiss can be sustained on the basis that defendants were "real estate brokers."

¶ 37        Our resolution of the foregoing issues renders it unnecessary to address the remaining arguments of the parties.

¶ 38                                    CONCLUSION

¶ 39        For the foregoing reasons, we conclude that the appellate court was correct in answering the certified question in the affirmative. We further conclude, however, that the appellate court erred in its analysis and that count IV of plaintiff's complaint should have been dismissed without prejudice. Accordingly, we vacate the appellate court's discussion, which found that defendants engaged in a "real estate transaction" by providing "other financial assistance," and we remand the cause to the circuit court for further proceedings consistent with this opinion.

¶ 40        Appellate court judgment affirmed in part and vacated in part; cause remanded.